UNITED STATES, Appellee

v.

ERNEST C. LITTRICE, Private, U. S. Army, Appellant

3 USCMA 487, 13 CMR 43

488

No. 2809

Decided December 11, 1953

LT COL Edgar R. Minnich, U. S. Army, CAPT William C. Irby, Jr., U. S. Army, and 1ST LT Alexander J. Jemal, Jr., U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT Kenneth A. Howard, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was tried by general court-martial in Germany for violation of Article 121, Uniform Code of Military Justice, 50 USC § 715, the three specifications thereunder alleging that he stole three cameras. He was found guilty of two specifications, sentenced to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for two years. The convening authority approved but reduced the period of confinement to one year, and a board of review in the office of The Judge Advocate General of the Army affirmed. The accused petitioned this Court for a review of his conviction and we granted his request limiting the scope of the review to the single issue of whether the pretrial conference of the acting commanding officer with the members of the court-martial denied the accused a fair trial.

At the commencement of the trial, and prior to plea, defense counsel interposed a motion which, in effect, was a challenge to all members of the court. In support of this motion, Lieutenant Colonel Lutz was placed on the stand to testify as to the instructions he had given the members of the court-martial prior to trial. He was the executive officer of Headquarters 8th Triple A Group, Wiesbaden Air Base, Wiesbaden, Germany, and was acting for, and in the absence of, the group commander. All officers detailed to the court-martial

**489**

were members of battalions which were under command of that officer. The meeting was held immediately prior to the time the trial commenced, and the special order convening the court and detailing the officers made reference to this particular case. Lieutenant Colonel Lutz testified in part as follows: That he had called all members of the court together and directed their attention to Circular 27–2, Seventh Army, dated February 29, 1952; that he inquired as to how many of the members had served on courts-martial previously, and ascertained that four or five had some experience; that he stated it was his duty, as senior army commander in the area, to brief the court as required by the circular and, to carry out its directions, he read verbatim one of its paragraphs; that he informed the members of the court-martial panel that they should not usurp the prerogatives of the reviewing authority; that it had been his experience that court-martial records received a thorough review in the Seventh Army; that he read excerpts from a letter from Headquarters, U. S. Army, Europe, September 8, 1952, on the subject of retention of thieves in the Army; that he explained that his reason for reading from this letter was that its distribution list disclosed it had been sent to group units only; and; that time had not permitted its reproduction for distribution to battalions.

Before leaving the witness stand, Colonel Lutz stated that he did not want to leave the documents with the court-martial because they were the only copies he had. He, however, volunteered the suggestion that the court take judicial notice of the contents of both the circular and letter. Defense counsel seized on the suggestion and the law officer replied that it could not be done unless they were made available for use by members of the court. Trial counsel suggested that the witness leave the papers with the court, and that defense counsel obtain additional copies for the record upon completion of trial. This was done and the two documents were admitted in evidence and identified in the record as appellate exhibits A and B, respectively. While Government

counsel assert there is no showing that the members of the court ▬▬▬▬ ▪ had actual knowledge of the provisions of the two exhibits, the record is such that, as a matter of law and fact, we must charge them with knowing the contents. There is no showing that they were not informed generally of the complete contents of both exhibits at the pretrial meeting—the documents were discussed in open court, the members were required to judicially know their contents, and they were available for reading and inspection.

Appellate defense counsel contend that the instructions of the acting commanding officer constituted an exercise of improper influence over the court-martial, and thus deprived the accused of a fair trial. Appellate Government counsel, on the other hand, argue that the instructions given to the court by the commanding officer were proper and expressly authorized by the Code and Manual provisions.

Over the years that military justice has been under criticism, and particularly during the period the new Uniform Code of Military Justice was being prepared by the Morgan Committee and studied by Congressional Committees, one of the most controversial issues with which all interested parties was concerned dealt with the extent officers in the chain of command should be authorized to influence court-martial activities. Recommendations came not only from those who were directly connected with the armed services, but also from civilians interested in the administration of military justice. A number of boards of outstanding civilians have, at various times, considered different aspects of the military judicial system and many individuals have objectively studied the problem. The seriousness with which they viewed the question of command control is shown by the following excerpt from the Report of the Committee on Military Justice of the New York County Lawyers Association to the Subcommittee of the House Armed Services Committee when it was considering the new Code (Hearings on HR 2498, 81st Congress, 1st Session, page 634):

". . . As to this, the Vanderbilt committee said:

'The system of military justice laid down in the Manual for Courts Martial not infrequently broke down because of the denial to the courts of independence of action in many instances by the commanding officers who appointed the courts and reviewed their judgments; and who conceived it the duty of command to interfere for disciplinary purposes. Indeed, the general attitude is expressed by the maxim that discipline is a function of command. Undoubtedly, there was in many instances an honest conviction that since the appointing authority was responsible for the welfare and lives of his men, he also had the power to punish them, and consequently the courts appointed by him should carry out his will. We think that this attitude is completely wrong and subversive of morale, and that it is necessary to take steps to guard against the break-down of the system at this point by making such action contrary to the Articles of War or regulations and by protecting the courts from the influence of the officers who authorize and conduct the prosecution.' "

It was generally recognized that military justice and military discipline were essentially interwoven. Nevertheless, a sharp conflict arose between those who believed the maintenance of military discipline within the armed forces required that commanding officers control the courts-martial proceedings and those who believed that unless control of the judicial machinery was taken away from commanders military justice would always be a mockery. That the Committees of Congress listened attentively and gave careful consideration to arguments by both sides is established by the contents of the House Armed Services Committee report. We quote from that report (H. Rept. No. 491, 81st Cong., 1st Session, page 8):

". . . We cannot escape the fact that the law which we are now writing will be as applicable and must be as workable in time of war as in time of peace, and, regardless of any desires which may stem from an idealistic conception of justice, we must avoid the enactment of provisions which will unduly restrict those who are responsible for the conduct of our military operations. Our conclusions in this respect are contrary to the recommendations of numerous capable and respected witnesses who testified before our committee, but the responsibility for the choice was a matter which had to be resolved according to the dictates of our own conscience and judgment.' "

Thus, confronted with the necessity of maintaining a delicate balance between justice and discipline, Congress liberalized the military judicial system but also permitted commanding officers to retain many of the powers held by them under prior laws. While it struck a compromise, Congress expressed an intent to free courts-martial members from any improper and undue influence by commanders which might affect an honest and conscientious consideration of the guilt or innocence of an accused. Both the Code and the Manual announce the same caveat. Article 37 of the Code, 50 USC § 612, states it in the following language:

"No authority convening a general, special, or summary court-martial, nor any other commanding officer, shall censure, reprimand, or admonish such court or any member, law officer, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding. No person subject to this code shall attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts."

On the command side of the ledger, we find some provisions which indicate that he is not to be too tightly fettered by the new Code. Article 25(c)(2), 50

USC § 589, directs that he shall appoint to the court-martial those persons who are, in his opinion, best qualified because of training, experience and judicial temperament. In addition, the Manual for Courts-Martial, United States, 1951, permits him to give certain general instructions to them. The first portion of paragraph 38 of the Manual, supra, is as follows:

"INSTRUCTING PERSONNEL OF COURT.—A convening authority may, through his staff judge advocate or legal officer or otherwise, give general instruction to the personnel of a court-martial which he has appointed, preferably before any cases have been referred to the court for trial. When a staff judge advocate or legal officer is present with the command such instruction should be given through that officer. Such instruction may relate to the rules of evidence, burden of proof, and presumption of innocence, and may include information as to the state of discipline in the command, as to the prevalence of offences which have impaired efficiency and discipline, and of command measures which have been taken to prevent offenses. Except as provided in this manual, the convening authority may not, however, directly or indirectly give instruction to, or otherwise unlawfully influence, a court as to its future action in a particular case. In this connection, see 67f."

The same delicate balance which beset Congress now confronts us. Justice can be dispensed and discipline maintained if one is not permitted to overwhelm the other. Both should be given recognition and both must be governed and guided by the necessities peculiar to the military service. The difficult test in this case is in determining whether the instructions given to the members of the court-martial unnecessarily impinged on the right of the accused to have his case heard by a court-martial unprompted by authority. Posed in a slightly different manner the question is: Did the instructions given by the acting commanding officer fall within the fair limits permitted by the Manual or were they of such a coercive nature that there was a violation of the Code restriction

against the exercise of improper influence upon the court-martial members? For purpose of presenting our answer to the question, we shall discuss the questioned instructions in the following order: First, those instructional or collateral matters contained in or implied from Circular 27–2, Seventh Army, dated February 29, 1952, regarding general court-martial proceedings; second, those pertaining to the letter from Headquarters, U. S. Army, Europe, dated September 8, 1952, concerning the retention of thieves in the Army.

Circular Number 27–2, Headquarters, Seventh Army, dated February 29, 1952, is entitled "Military Law General Court-Martial Procedures." It was issued some five months prior to the trial of this case and its contents were general instructions applicable to all courts under command of that headquarters. Colonel Lutz testified that during the conference held prior to trial he read paragraph 3b(6) verbatim. However, the document contains no paragraph enumerated as 3b(6) but does contain a paragraph 3c(6), and while it seems to contain instructions for commanders and not court members, it was apparently the one referred to. It is as follows:

"Instruction of eligible personnel of his command in the duties of members of courts-martial. In this connection, it is desired that the commander nominating a court, assemble the court prior to the receipt of any cases if practicable. He will satisfy himself that the court is qualified for courts martial duty; the need for the utmost impartiality and highest judgment; the necessity for arriving accurately at the guilt or innocence of the accused regardless of sentiment; the traditionally high Army standards of honesty, integrity or leadership, and moral conduct; and the necessity for dealing fairly but firmly with offenders will be stressed. Commanders nominating courts are expected to assume full responsibility that members of the court understand these matters thoroughly. At the same time the commander issues his briefing, a Staff Judge Advocate offi-

cer of this headquarters will instruct the court on matters listed in paragraph 38, MCM 1951, with particular emphasis on those contained in paragraph 1b, above, and Army policies as contained in Circular 21–1 and Circular 27–1 with Change 1, this headquarters."

Article 37, Uniform Code of Military Justice, supra, condemns two types of coercive conduct. The first prohibits a convening authority, or other commanding officer, from censuring, reprimanding or admonishing a court or member thereof because of the findings or sentence adjudged. The second prohibits coercing or influencing a court-martial member by any unauthorized means. The first part of the Article is not involved in this case and we do not believe the portion read could in any way improperly influence a court or trespass on the area protected by the second part. Obviously, emphasis on the need for impartiality, accuracy, and fairness cannot be considered objectionable, and admonitions concerning these matters come within the type of general instruction authorized by Manual provision. Furthermore, efforts to have commanders instill in court members high standards of honesty and integrity are commendable and are to be encouraged. We find nothing in this Circular which should be the subject of condemnation.

Had Colonel Lutz been content to rely on the instructions set forth in the Seventh Army Circular he would have stayed well within bounds. However, he went much further as he told the members that they should not usurp the prerogatives of the convening authority. In addition, he informed them that from his own experience as a member of a general court he had found that cases were thoroughly reviewed by the reviewing authority of the Seventh Army. Those statements more closely approach interference. As an abstract proposition, there is some value in explaining to prospective members of a court that a record, after completion of trial, would receive a thorough review. Cast in a proper background such a statement might be of assistance in helping court-martial members to understand trial and appellate procedures. On the other hand, if the explanation is given just before a trial, it is subject to an interpretation damaging to the accused. Of necessity, the ultimate effect depends in part on the manner in which the matter is presented by the commander but demeanor cannot be extracted from the record. Be that as it may, when Congress enacted the new Code, it intended that court-martial members be independent and not influenced by suggestions that post trial reviewers would shoulder the responsibility. When a commanding officer suggests to court members that other higher commanders carefully scrutinize every record and that the court should not usurp the prerogatives of the convening authority, they are either coerced or confused. What is his authority and what is theirs? Do they not overlap on both findings and sentence? Directions such as those cannot help but lessen the court-martial members' appreciation of their own responsibility for the findings and sentence. The prerogatives Colonel Lutz had in mind are not disclosed and those the court members would consider are well concealed. The most apparent interpretation of this statement is that the court-martial should give the maximum sentence to the accused, and thus give the convening authority plenty of latitude in exercising his powers of clemency. This is contrary to the sentence procedure outlined in paragraph 76a (4), Manual for Courts-Martial, supra, and when the statement is considered in connection with the instructions which stress the principle that thieves should not be retained in the service, it places the members in a situation where they are coerced into adjudging a punitive discharge.

Even were we to concede that the instructions we have so far mentioned might have little impact on the members of the court when we heap on the next admonitions, we pass beyond the doubtful stage. These are the important provisions from the letter, Headquarters, U. S. Army Europe, Subject: Retention of Thieves in the Army:

"In certain recent General Courts

**493**

Martial cases courts have properly found the accused guilty of larceny of substantial sums of money and property and then after establishing that the accused was a thief, have given sentences which improperly retain him in the Service. In view of this it appears absolutely necessary that your attention be invited to the following provisions of the Manual so that you may take the necessary action to prevent other such errors from occurring.

"First, the greatest care should be exercised in the selection of officers who are to be appointed as members of all courts-martial. They must be the best qualified by reason of age, education, training, experience, length of service, and judicial temperament. Moreover, when the individual members have verified by their performance that they have those qualities, it is proper that you recognize that fact by appropriate notation on their efficiency report or by other written communication.

. . . . . . .

'The imposition by courts-martial of inadequate sentences upon military persons convicted of crimes which are punishable by the civil courts tends to bring the armed forces into disrepute as lacking in respect for the criminal laws of the land.'

The Manual also states:

'Offenses such as larceny . . . and the like involve moral turpitude and are not to be treated as minor.'

and states:

'. . . the retention in the armed forces of thieves and persons guilty of moral turpitude injuriously reflects upon the good name of the military service and its self-respecting personnel.' "

Here again the language of certain of the sections is permissible under the Manual provision allowing a commanding officer to give general instructions to the personnel of the court-martial, and to include therein information as to the state of discipline in the command and the prevalence of offenses which have impaired efficiency and discipline.

We have no doubt about the accuracy of the statement that the prevalence of thievery among members of the armed forces is detrimental to morale. Frequent thefts of the personal property of members cannot be condoned, and a general policy discouraging the imposition of inadequate sentences for such offenses is entirely reasonable. Such a general policy may be necessary and desirable and its communication to the personnel of a court is proper. However, it is preferable to give it to the command rather than to a designated court-martial as there may be occasions when a court-martial, in good faith, and in a given case could conclude a punitive discharge was not warranted. It is one thing to announce a general policy and yet another to use that principle to influence the finding and a sentence in a particular case.

Undoubtedly the most offensive instruction given to the court members was the one dealing with ▮▮▮▮ ▮ efficiency reports. Again we have a perfectly fine concept put to a very questionable use. We cannot tear the statement out of the environment in which it was given nor can we ignore its obvious implications. It appears to have been a precept to the commanders but it was used inappropriately on court-martial members. No one would dispute that when services are well performed, the merits of the performance should be recognized. But commendations for outstanding performance should apply equally to all military duty and there is no compelling necessity to single out and emphasize the duties performed while a member of a court-martial and then mention efficiency report entries to personnel just before commencing consideration of a case. Actually the primary subject of the document was to place retention of thieves in the military service in its proper perspective. If considered for that purpose, no harm would be done; but immediately preceding the reference to efficiency report entries is a criticism of the sentences imposed by prior courts-martial. We believe that when the statement concerning the entering of commendatory remarks on the efficiency reports is considered in the

494

context of a letter, there is a veiled threat that those members of the court who vote to convict an alleged thief and join in sentencing him to be dishonorably discharged from the service will receive a reward in the way of a commendation while those who do not will go unmentioned. Courts-martial are manned by officers whose opportunities for advancement and promotion are controlled largely by their commanding officers and it is no reflection on their honesty and integrity to conclude that they desire to make a fine record. When an officer is lectured on the policy of his commander and then told that if he performs his duties as a member of a courts-martial outstandingly, his record will reflect a high standard of performance, he is apt to be influenced to take action which might be highly regarded by the commander. At least he has more mental reservation than has an officer who has not been subjected to the influence of suggestion.

We return now to the ultimate question of the balance between command function and military justice as we view it from this record. Under the peculiar facts of this case, we find command coercion which was prejudicial to the accused. The total of all the facts, circumstances and instruction given compel that conclusion. Here the record presents a factual situation in which a court-martial was ordered to try an alleged thief. At the time the court was assembled to be given instruction by the commander, the members knew the nature of the accusation and the identity of the particular person to be tried. Immediately before trial, the members were ordered to assemble and certainly the message conveyed must have been considered of grave importance by them because the commander made a special personal appearance and announced he was doing so because the letter had not been distributed to the officers of that particular battalion. Involved in the dissertation were statements to the effect that sentences which permit one convicted of larceny to remain in the service are improper; that imposition of inadequate sentences brings the armed forces into disrepute; that pre-

rogatives of the convening authority should not be usurped; that the court-martial's findings and sentence are relatively unimportant in view of the thorough review given by division headquarters; that failure to recognize that the Army is no place for thieves is a serious deficiency; that great care must be used in selecting officers to serve on courts-martial; and, that when individuals selected for that duty have verified by their performance that they have certain qualifications, appropriate notations will be made on their efficiency reports. With those admonitions ringing in their ears, the members began to hear this case on its merits. It requires little imagination to arrive at the reason why a finding of guilty was returned and the maximum sentence imposed.

Our attention has been called to several service cases which counsel for the Government contend support the acts of the commander in this case. They were all decided before the enactment of the Uniform Code of Military Justice and a reference to each would be of little value as a slight difference in facts and circumstances necessarily brings about a different result. However, by way of comment, we might state that in one of those cases a commander expressed to members of a court his desires that dismissal from the service should be decreed if any accused was found guilty of a particular offense. The court-martial in the reported case returned a finding of guilty of that offense and adjudged a sentence of dismissal but at the same time eight out of the ten court-martial members signed a petition of clemency recommending that the sentence of dismissal be commuted to a forfeiture of $50 per month for six months. The disparity between the sentence imposed and that considered proper established the prejudicial effect of command interference.

In order to permit military justice to operate properly, commanders must use discrimination in the manner in which they seek to maintain discipline by directions to members of courts-martial. This case is a concrete example of how a combination of events and statements can deny an accused the fair and just

**495**

trial contemplated by the Uniform Code of Military Justice. The conviction and sentence in this instance are the product of a trial not founded on those fundamental rights and privileges granted to one tried in the military system. The accused was convicted and sentenced by a court-martial which was not free from external influences tending to disturb the exercise of a deliberate and unbiased judgment. The attempt to enlighten the court members may have been prompted by the highest ideals but the method of presentation was steeped in prejudice.

The decision of the board of review is reversed, the findings and sentence are set aside and a rehearing is ordered.

BROSMAN, Judge (concurring) :

I concur in the principal opinion. At the same time I must confess to some degree of general unfriendliness toward the sort of pretrial conference contemplated by paragraph 38 of the 1951 Manual—quite apart from our action in this case. On the whole, I incline to believe that seances of this nature are less necessary than dangerous—and, all in all, they appear to me to be inconsistent with the character of law administration elsewhere contemplated by the Uniform Code. However, I feel sure that the law is solidly behind the author of the principal opinion in his view that there is nothing wrong *per se* with this sort of pretrial conference.

The only means by which I can reach a contrary conclusion is to hold that the language of paragraph 38 of the 1951 Manual constitutes a violation of Articles 37 and 66 of the Code, and hence must fall. On numerous occasions the members of this Court have united in holding that the provisions of the Code and the Manual occupy an identical authoritative position, in the absence of conflict. Certainly, therefore, before I may disregard paragraph 38, I must find it to be inconsistent with a mandate of the Code. And I cannot at all find this.

The paragraph of the current Manual under fire here is a carry-over from paragraph 87b of the 1949 edition. Moreover, Article of War 88, like Article 37 of the Uniform Code, prohibited attempts to influence the action of a court-martial. Since a well-defined administrative interpretation was extant under the prior statute, and since that statute was substantially reenacted, I find it impossible to conclude that Congress intended to invalidate the pretrial conference under the Uniform Code. This difficulty on my part is increased when I remember that, at least twice during the hearings on the Code, attention was directed to the existence of paragraph 87b of the 1949 Manual—and this provision dealing with the privilege of the convening authority to furnish pretrial advice and instruction to the court-martial was read into the record. Hearings before House Committee on Armed Services, 81st Congress, 1st Session, on H.R. 2498, at page 643; page 209 of hearings before Senate Committee on Armed Services, 81st Congress, 1st Session, on S. 857 and H.R. 4080. Congress appears in this instance to have made a knowing choice —at least as knowing an option as is ordinarily revealed by legislative history. I am sure that this Court should not ignore that election.

Chief Judge QUINN concurs in the result.