UNITED STATES, Appellee

v.

BURNICE O. ZAGAR, Private E-2,
U. S. Army, Appellant

5 USCMA 410, 18 CMR 34

No. 4867

Decided January 21, 1955

Lt Col Edward Duvall, U. S. Army, Maj Edwin Doran, U. S. Army, and 1st Lt Richard C. Shadyac, U. S. Army, for Appellant.

Lt Col Thomas J. Newton, U. S. Army, Lt Col William R. Ward, U. S. Army, Maj Irvin M. Kent, U. S. Army, and Maj Merle C. Rideout, Jr., U. S. Army, for Appellee.

PAUL W. BROSMAN, Judge:

A general court-martial convened at Orleans, France, tried the accused, Zagar, under two specifications alleging violations of the Uniform Code of Military Justice, Article 91, 50 USC § 685, the exact nature of which are unimportant here. Despite his plea of not guilty, he was found guilty as charged, and sentenced to receive a bad-conduct dicharge, to be confined at hard labor for one year, and to total forfeitures. The findings were approved by the convening authority with but slight modification, and the sentence was left intact. After affirmance by a board of review in the office of The Judge Advocate General, United States Army, this Court granted the accused's petition for review.

II

In this case we have before us a further problem having to do with a claimed attempt on the part of military command to exert unlawful influence on the members of a court-martial—a legal area with which we have been required to deal in several recent decisions. See United States v. Navarre, 5 USCMA 32, 17 CMR 32; United States v. Ferguson, 5 USCMA 68, 17 CMR 68; United States v. Isbell, 3 USCMA 782, 14 CMR 200; United States v. Littrice, 3 USCMA 487, 13 CMR 43. Here the issue of "command control" was raised at the trial by the lawyer for the accused through an extensive *voir dire* examination of all members of the court-martial—followed by a challenge for cause directed against each.

The *voir dire* opened with an interrogation of a Lieutenant Caskey, the junior member of the court. This officer stated that on December 21, 1953 —the day before the opening of the present trial—he had attended "a conference or a period of instruction" conducted by Colonel Harry C. Chuck, the command's staff judge advocate. It appeared later that all members of the court-martial were present on that occasion. Lieutenant Caskey stated that he personally "subscribe[d] to those things" mentioned by Colonel Chuck at the conference. Among these were (1)

the notion that it is improper for a court-martial "to consider extenuating circumstances prior to the findings," and (2) the view that, since a company commander is required to investigate charges before their preferment, it is "reasonably certain" from their very presence that a crime has been committed, and that the accused is the person who committed it. According to Caskey, Colonel Chuck thereafter referred to the inquiry made prior to trial by the Article 32 investigator, "who was parallel to a committing magistrate in civilian life," and explained that at this time "another decision was made to send the charges on further up." Colonel Chuck also appears to have emphasized the idea that when the charges "arrived at this headquarters . . . they were thoroughly considered by professional persons and that if there was anything that would not sustain the charges that at that time they would make the necessary changes."

Another member, one Lieutenant McConaghy, was then interrogated—and stated that he too subscribed to the position taken in the general instructions furnished by Colonel Chuck at this pretrial meeting. He recalled the latter's remark to the court that "you need not consider extenuating circumstances prior to findings," and as well "a statement that implied" that "after that investigation [one made of charges by a company commander] probably the charges were correct and that the man accused had done this crime." Lieutenant McConaghy asserted that he had felt free to ask questions of Colonel Chuck when the instruction period had ended.

Captain David P. Roye was of the opinion that Colonel Chuck "gave us a good orientation on the procedure in trials in military courts going from the very lowest to the very highest, through all the various appeals that can be made, automatically and otherwise." One Captain Maiello, a fourth member, subscribed "generally" to the principles expressed at the meeting, among them apparently the view that extenuating circumstances properly may not be con-

sidered prior to findings, but only as a matter "going to the sentence." A Captain Cohen gave like testimony.

Major James O. Lewis subscribed "in general" to the position taken by the Staff Judge Advocate at the questioned gathering, and remembered that Colonel Chuck had discussed "the fact we did not make the law. It was up to us to determine the facts in the case, and determine whether or not the accused was guilty of the violated law or regulation." He did not remember that the Colonel made any slightest reference to the matter of reasonable doubt. Lieutenant Colonel Anthony Shookus thought that the lecture simply described "how a military court functions as in the Manual." He added, "I do not recall specific duties other than he said we had to consider certain items."

Colonel Charles T. Murrey, the court's president, had been present during the instructional session. He explained that:

"  . . . Colonel Chuck's whole conversation was more an orientation, I think, than instruction for members of the court; giving more or less the background of procedure and investigation, as to how they were carried on and made more exact by each step, and general instructions as to the identification of the person being the person committing these charges under the specifications, and that they *actually—or it is a reasonable conclusion, that they had committed this crime. In other words, it was presumptive until proven otherwise by the court.*" [Emphasis supplied.]

Subsequently Colonel Murrey sought to qualify his answer by stating that Colonel Chuck "never said . . . or made . . . [an] indication" that following each stage in the processing of charges prior to trial it became more likely that a crime had been committed by the accused. The instruction simply was "a matter of showing carefulness of preparation," but the members of the court-martial still retained "the job of a civilian jury in coming up with the findings."

Lieutenant Colonel Orlando O. Whitman, next questioned, indicated that "Colonel Chuck was comparing the old Manual with the new one, and I got the feeling that a fair or great part of his instruction was for people who did not serve on the court since the new Manual."

Major Holliday, the court's remaining member, made a somewhat ambiguous statement respecting the impact of Colonel Chuck's "school session." He asserted that "some of the things that were brought up *can be readily changed by me* because under my oath as a member of the court, my conscience would be my guide on the things that are not brought out by either side." (Emphasis supplied.) When asked if he had felt free to ask questions at the conclusion of the Staff Judge Advocate's lecture, he replied that he "was rebuffed twice and I could not ask all the questions I wished."

In addition to the testimony coming from members of the court, the defense called as a witness a somewhat embarrassed major named Jenkins. This judge advocate officer, a lawyer assigned to Colonel Chuck's office, testified with great reluctance that he had overheard the lecture from his desk.[1] He related that Colonel Chuck had described for the benefit of court members three stages in the pretrial investigation of charges. First, he said, was that involving the company commander; there-

---

[1] This reluctance was articulated as follows:

"Gentlemen, before I testify as a witness, I would like to say for the record that yesterday afternoon Captain Horton came to my desk and merely asked me the question, 'Did I overhear the instruction to the court?' I had no idea other than to say, 'Yes,' which I had. And this morning I was called as a witness. And I want this court to know it places me in a rather embarrassing situation, and I want this court to realize it. I had no inkling I would be a witness until I was called this morning, nor did I have any inkling as to why the question was asked yesterday. So in due respect *to my own well being* I want that in the record." [Emphasis supplied.]

413

after that touching the Article 32 investigator; and finally "prior to trial, the Judge Advocates assigned to the case made their own investigation, and for the third time a decision was arrived at *as to the guilt of the accused*." (Emphasis supplied.) He further recalled the remark—mentioned earlier—to the effect that extenuating circumstances should not be considered "in arriving at a finding as to the guilt or innocence of the accused."

In resisting the subsequent challenges for cause, the trial counsel elicited from Major Jenkins a recollection that Colonel Chuck had said that "they were the jury and it was up to them to decide because sometimes witnesses would lie." Also the Major explained that Colonel Chuck's remarks were part of a discussion of the over-all processing of court-martial charges "from the accuser to the final review, if necessary, by the court of military appeals."

Colonel Murrey, under cross-examination by trial counsel, explained that Colonel Chuck gave instructions "about the same as given by any Staff Judge Advocate to a new court or panel," that "in no way did his briefing and orientation affect me as a member or president of a court," and that "there was nothing to influence me as a court member." Accordingly this officer indicated without reservation that he would accept an instruction from the law officer "concerning reasonable doubt and presumption of innocence." Major Holliday testified that "the remarks of the Staff Judge Advocate have no bearing on my determination, or within my own conscience, on the facts that may be presented in the case," and that he would "accept without reservation the instructions of the law officer." The remaining members of the court appeared to share the views last expressed by Colonel Murrey and Major Holliday. Indeed, in answer to questions put by the law officer, every member swore that the briefing received from the Staff Judge Advocate would not in any way influence him in reaching fair and proper findings based on the evidence admitted in court and the instructions given there.

The challenge for cause, interposed by the defense against each member on the ground that his continuance on the court would cloud the proceedings with "substantial doubt as to legality, fairness, and impartiality," within the meaning of the Manual for Courts-Martial, and was in every instance rejected.[2] See paragraph 62*f*(13). Thereafter Colonel Murrey was excused on peremptory challenge by the defense, and the trial proceeded to arraignment.

## III

Government appellate counsel have insisted that, in judging the validity of the court's action, we are bound by the insistence of each member of the court-martial that he would not be influenced in any degree by the statements of Colonel Chuck, the Staff Judge Advocate. We must reject this view at once, for—although we entertain no doubt of the complete sincerity of the officers concerned—we recognize the present applicability of the comment that "jurors are human and not always conscious to what extent they are in fact biased or prejudiced and their inward sentiments can not always be ascertained." See Stone v. United States, 113 F2d 70 (CA 6th Cir). Accord: United States v. Adamiak, 4 USCMA 412, 15 CMR 412; United States v. Rakes, 74 F Supp 645 (ED Va).

Moreover—and discounting arguendo the possibility of an unconscious effect of Colonel Chuck's guidance on the minds of court members—we must consider the possibility of untoward appearances—appearances which are certain to sap public confidence in the essential fairness of military law administration. See United States v. Adamiak, supra; United States v. Walters, 4 USCMA 617, 16 CMR 191; United States v. Stringer, 5 USCMA 122, 17 CMR 122.

---

[2] Under Manual procedure, the challenged member withdraws while the others vote on the challenge against him. If the challenge is rejected, he returns, another member withdraws— and so on. The soundness of this usage was questioned in United States v. Adamiak, 4 USCMA 412, 15 CMR 412. Cf. 28 USC § 1870.

Exactly what are these appearances here? In the first place, we cannot disregard the element of timing—the circumstance that the questioned lecture was held on the day immediately preceding the trial, and appears to have been beamed solely to members of the newly appointed court-martial chosen to try the instant case.[3] Thus, the likelihood that the remarks of the Staff Judge Advocate would be near the fore of court members' minds at the time of trial might readily have been foreseen.

Second, there is the circumstance that the officer furnishing the "orientation" occupied a professional legal position carrying high military grade and considerable authority—and therefore was one whose remarks would in all likelihood be heeded. Paragraph 38 of the Manual permits a convening authority to "give general instruction to the personnel of a court-martial which he has appointed, preferably before any cases have been referred to the court for trial."[4] See United States v. Littrice, supra. Paragraph 38 further provides that "when a staff judge advocate or legal officer is present with the command such instruction should be given through that officer." Therefore, the members of the court might properly have assumed that Colonel Chuck's remarks carried not only the weight of his own position as senior legal advisor in the command, but in addition bore the imprimatur of the military commander who had appointed the court.

The third significant item in the equation before us is the content of the remarks themselves. Unfortunately—and unlike the situation obtaining in another case recently heard by us—we are without a verbatim transcript of Colonel Chuck's lecture. See United States v. Ferguson, supra. In Article 39 of the Uniform Code, 50 USC § 614, Congress directed that the proceedings of a general court-martial be a matter of record—which has been taken to mean that they be transcribed verbatim. Cf.

United States v. Whitman, 3 USCMA 179, 11 CMR 179; United States v. Nelson, 3 USCMA 482, 13 CMR 38. Undoubtedly this requirement was designed to permit a more adequate appellate review of the proceedings of courts-martial through enabling appellate tribunals to know exactly what transpired at the trial level. An ancillary result, of course, is the prevention of public suspicion of military justice—which might well develop if there were no clear demonstration of all courtroom transactions prior to findings and sentence. In light of the strong policy of Article 39, as well as Article 37's explicit prohibition of "command control," we are sure that all doubts concerning the content of Colonel Chuck's lecture must be resolved against the Government.

Some of the statements made in the lecture present no problem at all. For one thing, the Staff Judge Advocate advised his listeners that matters of extenuation should not be considered to bear on guilt or innocence. The Manual for Courts-Martial is wholly consistent with this statement. See paragraph 75$c$(3). Indeed, we deem this sort of guidance to fall clearly within the purview of paragraph 38. Further, the lecturer emphasized that the task of the members of a court-martial is to deal with the facts, rather than the law, which they are to accept as announced by the law officer. Here, too, we find perfectly sound advice, which comes well within the scope of paragraph 38 of the Manual.

The area of exposition which appeared to constitute quicksand for Colonel Chuck was that in which he sought to explain to court members the three stages during which the appropriateness of charges against an accused is considered before reference for trial. Indeed, the testimony of the court's president at one point indicates that a

<hr/>

[3] Incidentally defense counsel have informed us in their brief that no other case was referred for trial to this particular court-martial.

[4] The charges here were referred for trial on December 18, 1953; Colonel Chuck's session with court members occurred thereafter on December 21, 1953 —and thus did not accord with the suggestion contained in the very directive under whose authority the lecture was purportedly given.

view was inculcated which distinctly suggested that an accused was "presumptively" guilty, else he would not have been brought before the court-martial. Cf. United States v. Dean, 5 USCMA 44, 17 CMR 44.

Further testimony from Colonel Murrey, and that of other auditors, indicates that the point may not have been made so baldly. Yet it is unsafe to disbelieve that persons attending the lecture might foreseeably have concluded that —in light of the emphasized caution in the pretrial handling of charges— it is highly probable that one brought to trial before a court-martial is guilty of the offense charged. Quite possibly this is true in many—perhaps most— cases, but it does not tend to produce independent judgment on the part of a court-martial to stress this fact almost immediately before the opening of a trial.

To be sure, in a general indoctrination course for military personnel it would be highly appropriate to emphasize the military establishment's tradition of care in the preparation and processing of charges before trial, and to exhort listeners loyally to maintain the practice. But if that same tradition is emphasized to a newly-appointed court—and shortly before it begins its deliberations—the matter takes on a different hue.[5] It then appears that the speaker, a person in high military and professional authority, is engaged in an attempt to implant in the court's mind an inference which can only harm the accused and impair the conduct of a fair trial—namely, one to the effect that an accused person would not be brought before a court-martial if he were innocent. Such an appearance falls squarely within the prohibitions of Article 37 of the Code.

We are more than sure that no civilian judge would be permitted to emphasize to the jury directly before the opening of a hearing that the case would never have reached the trial level had not (1) a warrant been filed, (2) probable cause been found by a committing magistrate, and (3) an indictment returned by a grand jury. A fortiori, he would not be allowed to point out that, in swearing out a warrant, a complainant would perforce proceed carefully, and that grand juries and committing magistrates are as a usual thing conscientious in their performance of official duty.

To bring such matters before a jury would, beyond peradventure, be deemed to negate the presumption of innocence, and to involve the presentation of hearsay opinion evidence in a most objectionable form. Indeed, items of this nature would constitute opinion evidence bearing on the very issue which the jury was impaneled to decide—and would include a conclusion formulated without any of the safeguards of an adversary proceeding. Hearsay, too, would be present for the reason that neither the members of the grand jury, the committing magistrate, nor the person on whose complaint the warrant was issued would have been before the court and subject to confrontation and cross-examination. Further, the evidence utilized by those individuals in the formulation of their several opinions might be such as is inadmissible at trial, and the conclusions may also have been formed quite without reference to the standard of reasonable doubt necessarily applied by a petit jury in reaching its verdict.

In the military context, the drawing of inferences from supposed opinions of persons not before the court-martial is equally obnoxious. In this setting, too, there is no requirement that the accuser be convinced beyond a reasonable doubt of the accused's guilt—and on the basis of evidence admissible in a military tribunal. Nor is such certainty required of the Article 32 investigator as a basis for *his* recommendation—just as "probable cause" for the civilian committing magistrate does not import moral certainty of the accused's guilt. Indeed, military cases are not infrequently referred for trial despite a contrary recommendation from the Article 32 investigator. See, e.g., United States v.

---

[5] The vital effect of the context within which the pronouncement here was made may be compared to the principle that even free speech is a qualified right. Thus, one is not privileged to shout "Fire" in a crowded theater.

Voorhees, 4 USCMA 509, 16 CMR 83; United States v. Armstrong, 4 USCMA 248, 15 CMR 248 (original record).

The staff judge advocate, too—and quite properly—may well suggest the trial of charges not because he is personally sure of the accused's guilt, but instead because, after study, he believes it desirable that the veracity of conflicting witnesses be gauged by a court-martial in the course of an adversary proceeding. Moreover, in many instances an accused—and sometimes on the sound advice of counsel — may choose to remain silent, or may reserve evidence in his favor, until trial by court-martial. In sum, pretrial determinations—military or civilian—made during the processing of charges against an accused person constitute frail reeds indeed on which to rest inferences of guilt.

According to Major Jenkins' version of the challenged lecture, the speaker emphasized that a court-martial should exercise care in the return of findings of guilty because of the possibility that the prosecution's witnesses may be falsifying. However, this does not at all suffice to remove the sting. Indeed, after hearing this instruction, a court member might sensibly conclude that he should convict unless convinced that Government witnesses are lying. In practice, this amounts almost to a presumption of guilt, since the burden on the defense of showing perjury on the part of prosecution witnessees is undeniably heavy—and certainly heavier than the usual one of raising a reasonable doubt concerning the accused's guilt. Moreover, a court member, wedded to this interpretation of Colonel Chuck's remarks, might easily overlook the possibility that the Government's witnesses were honestly mistaken to the accused's detriment — although they were not consciously seeking to "frame" him.

We believe that enough has been said to demonstrate the dangerous impropriety of the lecture delivered by Colonel Chuck—with due allowance for uncertainty as to the exact content of his remarks. The suspicion raised under these circumstances is simply too great, and the policy reflected in paragraph 38 of the Manual too small, to permit us to uphold the court's action in overruling the several challenges for cause—rested by the defense on the "substantial doubt as to legality, fairness, and impartiality" of any action reached by the instant court-martial.[6] And we must add that the Government's effort to dispel suspicion by describing the conference as in essence "educational" was seriously compromised by Major Holliday's testimonial assertion that, when he sought to inform himself through questions addressed to Colonel Chuck, he was "rebuffed."

## IV

In conclusion, we reiterate that reversal here is in no degree predicated on doubt of the honesty and integrity of the several members of the court-martial. It reflects instead an insistence that persons not members of a military criminal tribunal observe the Congressional policy directed against conduct tending to impair the freedom and impartiality of the judgment of the court's members. Accordingly, the findings and

---

[6] Government appellate counsel have urged that the instructions of the law officer removed all flaws resulting from the Staff Judge Advocate's lecture. We are inclined to doubt that such prejudice could be rectified by instructions of any sort. Pretermitting this point, however, we observe that the instructions in the case at bar are not clear, pointed and specific enough to amount to a direction that court members should put the words of the pretrial lecturer out of their minds, and should draw no inference whatever from the circumstance that the case had been referred for trial. This much, we think, is required. Moreover, the instructions relied on by the Government were given at the *end* of the trial as instructions usually are—and *not* prior to arraignment, and while the issue of the Staff Judge Advocate's lecture was still fresh in the court members' minds. Further, the instructions relied on came to no more than the conventional ones dealing with the presumption of innocence, reasonable doubt, and the like—and no slightest effort was made to link their content to the peculiarities of the present situation.

sentence must be and are disapproved and a rehearing is ordered.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

I am unable to accept the conclusion of the majority that this case should be reversed. The precise legal reasons for the reversal are not spelled out but I sense an attempted admixture of sanctions and specific prejudice. For my purposes, it is unnecessary to unscramble them as; whether they are considered separate or together, they do not establish good reason to grant a rehearing. As I view this record there is only one legal question involved and that is, was the accused denied a trial by a fair and impartial court-martial? I conclude he was not, and in arriving at my conclusion I am willing to rely on the sworn testimony of each officer on *voir dire* that the orientation lecture would not influence him, in any manner, in reaching a fair and just finding and sentence based solely on the evidence adduced and the instructions given by the law officer at the trial. Where, as in those cases cited by my associates, an attempt has been made to bribe a juror and the matter is paraded before the entire panel, whether the impact on any given juror can be self-assessed need not now be determined. But, unless a statement of a juror under oath that he has no fixed opinion on the guilt or innocence of an accused, and that he will decide the case on the evidence and the instructions of the judge, is accepted as worthy of belief, then all trial courts might just as well cast out *voir dire* of jurors. Those were my views in United States v. Isbell, 3 USCMA 782, 14 CMR 200, and they remain unchanged. It may be, as my associates seem to hold, that appellate judges can better determine the mental state of a court-martial member, than can the member, but I would conclude otherwise.

It is not unusual for me to use Article 59 (a) of the Uniform Code of Military Justice, 50 USC § 646, as the balancing factor to control the disposition of a case. I am not yet convinced that that Article is to be used at the discretion of appellate judges. It provides that a case shall not be reversed unless an error materially prejudices an accused; and unless he makes a fair showing to that effect, an affirmance should be the order. Here, had the instruction given at the orientation conference influenced a finding against this accused, then obviously prejudice would be apparent, but such was not the effect. The theory of the accused was that each member of the court was subject to challenge for cause. His grounds were that to permit any member to sit would prevent the trial from being free from substantial doubt as to its legality, fairness, and impartiality. The court-martial found against the contention of the accused but this Court overturns the finding on the supposition that the court members did not know their own mind. In order to support that seldom relied on conclusion, the record should, at least, contain some evidence that the subjects discussed at the conference were so indelibly impressed on the minds of the court-martial members that the effect could not be measured by them or erased by ordinary instructions. If I were to hold that all court members were removable for cause over their own disclaimer of disqualification, I would be reasonably certain that cause, in fact, and not in fancy, had to be present.

It is most difficult to find civilian precedents which throw any light on the subject before us because in those cases which have reached appellate levels, there is usually some question about the guilt or innocence of the accused. Under those circumstances, any measurable impact might tip the scales against the defendant. The more nearly the scales are in balance, the greater the chance they will be disturbed by outside influence. But here we are not faced with equilibrium. As will be later argued, in this instance the pan of guilt is filled to overflowing, while the one of innocence contains nothing but a presumption. To offset the imbalance, the Court takes what is no more than a tremor of a leaf and converts it into a quake of such severe intensity that the scales themselves fall

418

from the impact. By reversing this finding and sentence, all that is accomplished is to require the Government to retry an accused who, under oath, has admitted his guilt of at least one offense, and who has been convicted of the other offense by evidence which is so compelling that the court-martial had to return a finding of guilty.

The charges were laid under two specifications, both alleging violations of Article 91, Uniform Code of Military Justice, 50 USC § 685. The first alleged willful disobedience of a lawful order of a chief warrant officer. The second charged the accused with assaulting a superior noncommissioned officer who was then in the execution of his office. At the trial of the case, there was no factual dispute about the first offense. Two Government witnesses established all elements of that crime beyond any question of doubt and, while the accused elected to take the witness stand to testify on the second specification, he reserved his preferred status not to testify about the first offense. However, when he was later sworn, and testified under oath, in mitigation, he judicially admitted his willful refusal to obey.

In his testimony on the second specification, the accused admitted assaulting the named noncommissioned officer. His defense was that he was so intoxicated he had no knowledge of the fact that the victim was a corporal. The evidence of the Government witnesses established clearly all elements of the offense and further established that the degree of intoxication was not so great as to interfere with the mental faculties of the accused. During his examination, he testified in minute detail as to all events which had transpired during a period of five hours before the assault. Moreover, his mind was so unaffected he was able to understand that: The corporal had ordered him to leave the dayroom; when he refused to obey, the victim left to inform the officer of the day; he intended to prevent the victim from carrying out his mission and jumped through a window to intercept him; he played pinochle and he observed others playing hearts; there was a difference between the temperature inside and outside the dayroom; and the light in the room was not too bright and two globes were burning. In addition, he first testified that he did not hit the corporal because he concluded "it would be of no use," and then he subsequently stated that he grabbed the corporal by the collar and told him to "wait a minute." It readily appears from that testimony that accused's mental faculties were not impaired by the use of intoxicants, and this Court would have affirmed the law officer's ruling had he not instructed on the issue of intoxication. In spite of that record of facts, events, and circumstances, the majority of the Court hold this accused is entitled to be retried on the merits. I protest because the instructions given at the orientation conference could not have influenced the court-martial members in determining the guilt of this offender. I believe it fair to say, that conference or no conference, the same findings would have been returned and no different result can possibly be expected on a rehearing.

I have yet to dispose of any possible influence on the sentence. It is obvious that prejudice would result if the general character of the orientation conference had a tendency to add to the severity of the sentence. Apparently, the conference did not deal specifically with the principles governing sentences as they are unmentioned on *voir dire*. However, assuming arguendo they were alluded to, the record is the best evidence of the lack of prejudice on the punishment imposed. The accused was charged with two offenses which would have permitted the imposition of a sentence of confinement for three years, forfeiture of all pay and allowances, and a dishonorable discharge. The sentence meted out was a bad-conduct discharge, confinement for one year, and forfeiture of all pay and allowances. The length and severity of the sentence must be measured by the nature and gravity of the offenses committed and the previous record of an accused, in so far as it is relevant and properly disclosed to the court. Here, prior to sentence, the accused testified in mitigation and in doing so he disclosed that approximately eighteen months before the time of these crimes he was convicted of lar-

ceny, sentenced to a dishonorable discharge, and a year in confinement. He was placed in a rehabilitation training center, and after having served the required time, the punitive discharge was suspended and he was given an opportunity to redeem himself. That he failed miserably is attested to by his present predicament. Under those circumstances, it would be a bit unusual for any court-martial to adjudge a sentence more lenient than the one imposed on this accused. If there is any duty on one who asserts prejudice to shoulder the burden of showing its probable existence, and I assume there is, the accused in this case does not bear his load.

Paragraph 38 of the Manual for Courts-Martial, United States, 1951, provides that a convening authority may, through his staff judge advocate or legal officer, or otherwise, give general instructions to personnel of a court-martial which he has appointed, preferably before any cases have been referred to the court for trial. The conference held was in keeping with that authorization. Not counting the law officer and counsel for both parties, there were eleven officers detailed to serve as members on this general court-martial. Those officers all attended the orientation lecture and so I believe it to be a fair inference to conclude the purpose of the meeting was not to discuss any particular case. While my associates say there was only one case referred to that court, I have no way of knowing whether anyone was cognizant that such would be the situation when the conference was held. I do, however, know from the record that no particular case was mentioned at the meeting and nothing was said which would bring the facts, issues, or sentence of this case to the attention of the listeners. All officers testifying fix the subject as not being restricted to any given situation and for that reason any injury to this accused must be extracted from generalized statements.

The court quotes at length from the testimony of some of the witnesses and seizes upon part of the language used by some of them to establish that they were misinformed on the law. Personally, I believe the lack of unanimity about the principles of law advanced by the Staff Judge Advocate and the uncertainty of their application argue for the proposition that whatever was said, its effect could have resulted in no more than a slight and indistinct remembrance on the part of the listeners. It is to be remembered that some eleven officers attended the conference and they were all testifying on *voir dire* from memory. At best, it was difficult for them to express accurately the principles advanced by Colonel Chuck, and that is understandable in view of the scope of the subjects discussed. Most of the witnesses testified that the lecture covered the entire legal processing of an accused from the time of his accusation to final review by our Court. To expect an officer to leave the class with all of the discussed principles, be they expounded rightly or wrongly, so firmly imbedded in his mental senses that super-cautionary instructions must be given to erase their effect is stretching the point. In my judgment every trace of any effect could be removed without difficulty by the instructions given. While this case is analogized to United States v. Deain, 5 USCMA 44, 17 CMR 44, I find no similarity as the flagrant violations requiring reversal there are not present here.

It is suggested in a rather smug vein that an embarrassed major was called as a witness. I do not know why his apologetic manner is important. If he was embarrassed or reluctant to testify it does not follow that the purpose of the meeting was contrary to the Code or that the officers in charge were trying to operate in secret. Defense counsel knew of the meeting as he had previously discussed it with this witness. As a side issue the Major's discomposure may have resulted entirely from an innocent desire not to be suspected of initiating a proceeding which involved his immediate superior. But that is all beside the point. His only importance in this lawsuit is the evidence he supplies. I am perfectly willing to accept his testimony as being the most accurate reproduction of Colonel Chuck's exposition on the law. I am quoting verbatim from his testimony:

420

". . . And I heard that an investigation is established in three stages. First, there was an investigation for the command in charge. A decision was arrived that an accused had committed an offense. Then there was another investigation by a qualified officer under Article 32 which established—made by an experienced investigator —, where the accused was present and was asked to give all the evidence in his favor, if any, and where a thorough impartial investigation was made. And it was also at this second stage that a decision was arrived at as to the guilt of the accused. Then prior to trial, the Judge Advocates assigned to the case made their own investigation, and for the third time a decision was arrived at as to the guilt of the accused.

. . . . . .

"A. Yes, I heard that. This Court was told that they could not consider extenuating circumstances in arriving at a finding as to the guilt or innocence of the accused. That is what I heard.

. . . . . .

"Q. Do you recall any remarks by Colonel Chuck to the court concerning the duties of the court and the powers of the court in relation to their judgment and the credibility of witnesses?

"A. Yes. He told the court they were the jury and it was up to them to decide because sometimes witnesses would lie.

"Q. Referring to the question of the defense counsel and your answer concerning the three stages of investigation prior to trial. Were those remarks by Colonel Chuck a part of a discussion of the total processing of the court-martial from the accuser to the final review, if necessary, by the court of military appeals?

"A. Yes, sir; basically.

"Q. And this was a part of the total procedure?

"A. Yes, sir. It was.

"Q. Did the remarks of Colonel Chuck to the court include any specific references to the duties and powers of the court as the finders of fact?

"A. Yes. He told the court that they were the jury and that it was up to them to decide. The same as a civilian jury."

I dare say that substantially the same lecture has been given to most officers in the service. Anyone familiar with the Code would be well acquainted with the principles being advanced. I recognize that in the Major's reproduction there appears to be one concept not stated accurately. He testifies that Colonel Chuck stated: "a decision was arrived at as to the guilt of the accused," when no doubt to be absolutely correct the statement should have been phrased to say "the probable guilt." But when that omission is considered in the light of the other principles given by Colonel Chuck, the instructions by the law officer immediately following the *voir dire* to the effect that "the evidence presented in the proceedings should not be considered by the court in any way in judging the merits of the case or in reaching its findings or decision as to the innocence or guilt of the accused," and his charge to the members of the court-martial just before deliberations as to their duty to weigh the evidence, the burden of proof, and the presumption of innocence, there just is no possibility of prejudice.

Much is said about the untoward appearances of a criminal cause which may destroy public confidence. When that concept is exposed to light of this record, it is inapplicable. When there have been clandestine and secret machinations or communications which are difficult to detect and more difficult to prove, then that generality may be successfully and properly considered. But when an orientation conference is held pursuant to statutory authorization and the only point in issue is whether instructions were incorrect, and, if so, could they be corrected by appropriate instruction, the enunciation of that principle is a makeweight. I would, nevertheless, affirm as by any reasonable standards this accused has had his day in court.