UNITED STATES, Appellee

v.

SPENCER WILLIAM WHITLEY, Teleman Seaman, U. S. Navy, Appellant

5 USCMA 786, 19 CMR 82

No. 6017

Decided May 13, 1955

CDR Earl C. Collins, USN, for Appellant.
CDR George P. Kurtz, USN, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

This case requires us to consider an error which should no longer be found in military records. It grows out of

an order by the convening authority adding a senior member to a special court-martial which was in the process of hearing the case of this accused. Contrary to his plea of not guilty to a charge of larceny, the accused was found guilty. He was sentenced to a bad-conduct discharge, forfeiture of $50.00 per month for three months, and confinement at hard labor for the same period of time. The convening authority approved only so much of the sentence as provided for confinement at hard labor for 45 days, forfeiture of $50.00 per month for two months, and a bad-conduct discharge. He, however, suspended the execution of the punitive discharge for the period of confinement and four and one-half months thereafter. In the due course of events, the findings and sentence were approved by intermediate appellate authorities, and we granted a petition for review to determine whether the convening authority prejudiced the accused by improperly interfering with the legal powers vested in the president of the special court-martial.

The facts of the substantive offense are of no materiality and we, therefore, content ourselves with reciting only those which give color to the particular issue. Generally speaking, they are as follows: The original order appointing the court named one Lieutenant, three Ensigns, and a Warrant Officer as members. One of the ensigns was shown as absent and it appears he was properly excused by the convening authority. The Lieutenant was challenged peremptorily by the defense but three qualified members remained and the court was convened. The accused was arraigned and after his plea of not guilty the prosecution began the presentation of evidence. When the first witness testified on direct examination, he commenced a rambling recitation of facts. The following colloquy between defense counsel, trial counsel and the president of the court places the issue in its proper perspective:

"DC: This is improper. You should be asking the questions. This

narrative form is not correct procedure.

"TC: I see no reason that the witness cannot relate the events occurring during the evening as the testimony itself is relevant. The whole sequence of events that . . .

"DC: As a result of your questioning, you certainly may. But not just giving a narrative account of these alleged events. The defense objects.

"PRES: Objection sustained.

"TC: Request that the court be recessed for about 5 minutes.

"PRES: Request granted.

The court recessed at 0935 hours, 6 July 1954.

The court opened at 0937 hours, 6 July 1954.

"TC: All who were present when the court recessed are now present.

"TC: The prosecution would like to excuse the witness at this time and state that the convening authority has requested that the court be recessed pending appointment of a more qualified president of the court.

"DC: That's improper procedure.

"TC: It is the power . . .

"DC: Not after the pleas have been received.

"TC: It is the power of the convening authority to do so. Well, all I know is they checked with legal. They just called and he wants the court recessed until the appointment of president."

The president was not content to be ousted for the reasons given by trial counsel and he directed a recess to determine the authenticity of the verbal order. The recess was short and when the court reconvened, trial counsel requested a continuance until after lunch. The court opened for its afternoon session and trial counsel requested a further adjournment until 9:00 o'clock the following morning. That request was granted and when the court opened again it was presented with an order by the convening authority appointing a new senior member of the court, who, by virtue of rank, became the presiding officer. Appropriate objections to

the procedure were preserved by defending counsel.

A board of review in the office of The Judge Advocate General of the Navy considered this question, and after reasoning that it was a procedural error, went on to hold that, because the convening authority had taken action in mitigation, any prejudice resulting from the trial procedure had been purged. We, of course, concur with the first conclusion of the board that error occurred, but we disagree with the second. To the contrary, we find that the accused was denied a substantial right to his prejudice, which could not be cured by the subsequent action of the convening authority, and therefore, the present findings and sentence cannot stand.

The only provision of the Code which is material to the issue is found in Article 29(c), 50 USC ▪ § 593. We quote the material portion:

"Whenever a special court-martial is reduced below three members, the trial shall not proceed unless the convening authority appoints new members sufficient in number to provide not less than three members."

That Article is the subject of discussion in paragraph 37 of the Manual for Courts-Martial, United States, 1951, which provides:

"Subject to the exceptions stated below (37b), it is within the discretion of the convening authority to make changes in the composition of courts-martial appointed by him. For instance, he may appoint new members to a court in lieu of, or in addition to, the members of the original court; or he may appoint a new law officer, trial counsel, or defense counsel in lieu of the personnel designated to perform those respective duties by the original appointing order. When practicable, the convening authority should change the composition of courts-martial from time to time to provide the maximum opportunity to eligible personnel to gain experience in the administration of military justice."

There is no mention as to how early or late in the proceedings any particular change can be ordered appropriately but the reference to paragraph 37b of the Manual is not without significance. Undoubtedly, prior to arraignment, the convening authority has discretion to change the composition and membership of the court in whole, or in part, but his authority narrows considerably after the accused has entered his plea. In paragraph 37b, we find this statement:

". . . Ordinarily, he [the convening authority] should not appoint additional members to a general or special court-martial after the arraignment of an accused unless the court is reduced below a quorum. . . ."

We interpret the word "ordinarily" to place some restriction on the powers of a convening authority after arraignment, and we believe the limitation to be this: After a plea has been entered, good cause must exist before additional members may be appointed, if there is a quorum present to continue with the hearing. In United States v. Grow, 3 USCMA 77, 11 CMR 77, we held that, after arraignment, a convening authority may remove court-martial members only where good cause is shown, and we believe the same standard must be met in the converse situation, which is presented here.

One additional provision of the Manual which casts some ▪ light on this question is found in paragraph 5a(6), which provides:

"An officer who has power to convene a general court-martial may determine the cases to be referred to it for trial and may dissolve it, but he cannot control the exercise by the court of the powers vested in it by law. In this connection, see Article 37."

This paragraph is equally applicable to special courts-martial.

A mere reference to the colloquy

**789**

hereinbefore quoted convinces us that the action of the convening authority contravened both the spirit and the letter of the Manual provisions. The action taken by him imposed command control over the very heart of the judicial processes and opposition to that is a cornerstone of the Uniform Code of Military Justice, United States v. Littrice, 3 USCMA 487, 13 CMR 43; United States v. Hunter, 3 USCMA 497, 13 CMR 53. A president of a special court-martial is by Article 51(a), 50 USC § 626, authorized to rule on all interlocutory questions. There can be little doubt but that an objection to the admissibility of testimony or to the manner in which a witness is relating his testimony involves that type of question. In this instance, the president of the court apparently sensed that the narrative form in which the witness was presenting his testimony would afford defense counsel little or no opportunity to prevent irrelevant and incompetent evidence from reaching the court members. He, therefore, sustained defense counsel's objection and directed trial counsel to proceed by question and answer. The latter objected to the ruling, and in a certain sense he took an immediate and very effective appeal from the order. He asked for a recess, consulted with the convening authority and, according to his report to the court when it reassembled, he had obtained a directive from that officer to the members that proceedings would be held in abeyance until a more qualified president was available. The convening authority's subsequent order not only effectively reversed the ruling of the president of the special court-martial on a matter of law, it went much further. By that order the presiding judge of the court was removed and replaced by an officer who, representatives of the Government must have expected, might be more considerate of the prosecution's interest. Stated tersely, the convening authority removed the judge because trial counsel was dissatisfied with a ruling. To say the least, this does not amount to good cause for removing a president and reversing a ruling. We can find no clearer or better way for a

790

commander to bend the court to meet his whims and run afoul of the proscription that he cannot control the exercise of powers granted the court by law.

The Government seeks to sustain the order of appointment on the theory that the president of the special court should be a lieutenant and not an ensign and that, therefore, the convening authority had good cause to replace this junior officer with one who had more judgment, experience and seniority. The argument might have some merit had that been the basis for the addition of the new member but it is unimpressive in the background of this record. Conceding, arguendo, that as a policy matter a more seasoned officer should be used as the president of a special court, the proceedings, so far as they went, indicate competency on the part of the one then presiding. No one has had the temerity to suggest before us that his ruling on the objection establishes that he lacked judicial capacity. Furthermore, the contention that his assumed lack of experience was the reason for his removal is exploded by the facts. Trial counsel was early apprised of the circumstances that the case was to proceed with an ensign as president of the court. In spite of his knowledge, he permitted the court to be convened, he allowed the accused to enter his plea, he disposed of the preliminary matters and he started the presentation of his evidence. It was only after he had received an adverse ruling that he sought the assistance of the convening authority. A record could hardly speak louder than does this one that the sole cause of the change in court personnel was to obtain a presiding officer who might be more considerate of trial counsel's demands. The action taken almost reaches a violation of Article 37 of the Code, 50 USC § 612, as the removal could hardly be for other than disciplinary purposes. There just is no merit to the contention advanced, as the record is barren of any fact or circumstance indicating a lack of ability on the part of the presiding officer. To us it appears that the objection made by de-

fense counsel was proper; that the president was operating in a discretionary area; and that he exercised his discretion properly. When witnesses are permitted to ramble, much hearsay testimony finds its way into a record, and the president of a court or a law officer can better screen incompetent and irrelevant testimony if counsel and the witness proceed by questions and answers. That, however, is beside the point, because as we interpret the phrase "good cause," when used as a basis for removing a court-martial president, it means something more than mere disagreement with a ruling on one interlocutory question, be the decision right or wrong. To clarify the point, we do not say that had the trial proceeded far enough to establish that the president was legally unfit to preside over the court, some action might not have been taken by the convening authority to correct that situation. However, no such showing was made here, and the only inference which is reasonably permissible is that the Government desired to obtain a president who, as we have previously observed, would be more favorable to its side of the case. In fairness to the newly selected officer, we do not say that the Government obtained what it was seeking, but we do surmise that he, together with the other members, served on the court with a sword of command dangling over their heads.

Now for the prejudicial aspect of this case. It is a cardinal principle of military law that an accused is entitled to have his case decided by members of a court-martial who are free from external influences tending to disturb their mental freedom, United States v. Littrice, supra. To use command prestige to influence legal rulings in the trial arena is distinctly forbidden. The right to a fair trial demands that a court member be permitted to judge solely according to his conscience, and a threat should not be held over his head to sway his decision against one accused of an offense. The Uniform Code of Military Justice has erected a barrier between the commander and the court and the former is prohibited from going over, around or under it to disclose his desire for a conviction, United States v. Ferguson, 5 USCMA 68, 17 CMR 68. Here the court that was hearing this case was composed of junior officers who were impressed firmly with the understanding that the convening authority would brook no interference with the prosecution. One member of the court had tried to rule in accordance with his honest convictions and he was forcefully reminded that he lacked the qualifications to sit as a presiding officer. That act of replacing him could not help but leave its imprint on those who had to decide the ultimate guilt or innocence of this accused. Having witnessed the removal of the president, those who were to weigh the facts and, as it turned out, impose the penalty were left with an overweighted choice. So far as this record shows they were presented with the alternative of ruling with the Government or risking the ire of the person present who had a pipeline to the convening authority. Had the commander remained quiescent, these court members could have deliberated with only the normal pressures of military justice influencing their deliberations, but when they were required to decide the issues and determine the appropriateness of sentence with command control paraded before their eyes, they had some very persuasive influences molding their opinions. It would seem to go without saying that when their commander stepped out of character and joined the side of the prosecution, they were faced with illegal interference which placed them in an embarrassing and delicate situation. The mental effect on them quite probably was such that they were required to consider the merits of the case with their minds shackled by the advance warning given by their superior. To require an accused to stand trial before a court-martial manned with members who have been notified by positive acts that the commander deals summarily with those who decide adversely to the Government is to place on him a heavy burden he is not required to assume. The difficulties encountered in defending a criminal prosecution cannot

791

be multiplied by methods similar to the one used here without throwing the scales of military justice off balance. When the odds in favor of conviction have been increased by outside interference, an accused has been prejudiced materially, as he is at least entitled to be tried before an uncoerced fact forum.

Pretermitting any effect on the sentence, we are here confronted with a case which was contested and there was at least some doubt about the accused's guilt. The crime charged was larceny and that offense involves a specific intent. The testimony shows the accused had a good reputation but because of a highly intoxicated condition he remembered nothing about his activities at the time of the loss. Whether he intended to steal was specifically placed in issue and that essential element of the offense was sharply in dispute. Without relating all of the facts, it is apparent that any disagreement which the court was called upon to reconcile would be influenced by the commander's interference. That is command control in one of its most serious aspects. Further comment should be unnecessary.

The decision of the board of review is reversed and a rehearing ordered.

Chief Judge QUINN concurs.

BROSMAN, Judge (concurring):

I concur without reservation in the disposition of this case and in almost everything said in the principal opinion. However, in assessing prejudice, its author makes some point of the presence of conflict in the evidence of intent—the possible "closeness," as I understand him, of the case before the court-martial. It is likely that this argument entered the opinion as a mere makeweight, but if it amounts to more than this, then I must dissociate myself from it.

Those familiar with prior expressions of my views in this area will recognize the wholesale immateriality of this consideration to me. I can always be counted on to reverse in a case like the present one—this in the face of the most overwhelming evidence of guilt on the part of an accused person. Often in such an instance there will be no difficulty in demonstrating the existence of a measurable risk of specific prejudice. However, failing this, the doctrine of general prejudice, and even that of military due process, lie ready to hand—and so, if one prefers it, does the notion that "the accused was not accorded a fair trial."