UNITED STATES, Appellee,

v.

Staff Sergeant Don A. TREAKLE, SSN 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, United States Army, Appellant.

CM 443599.

U.S. Army Court of Military Review.

29 June 1984.

Cohen, J., filed opinion concurring in result.

Yawn, J., filed opinion concurring in part and dissenting in part.

Captain Audrey H. Liebross, JAGC, argued the cause for the appellant. With her on the brief were Colonel William G. Eckhardt, JAGC, Lieutenant Colonel William P. Heaston, JAGC, and Major Edwin D. Selby, JAGC.

Lieutenant Colonel Thomas M. Curtis, JAGC, argued the cause for the appellee. With him on the brief were Colonel James Kucera, JAGC, Lieutenant Colonel John T. Edwards, JAGC, Captain Samuel J. Rob, JAGC, and Captain Thomas J. Benjamin, JAGC.

Before the Court sitting EN BANC.

## OPINION OF THE COURT ON FURTHER REVIEW

WOLD, Senior Judge:

### I. *History*

This case is before us on remand from the United States Court of Military Appeals for consideration of allegations of unlawful command influence.

On 5 October 1982, appellant, a member of the 3d Armored Division, appeared before a general court-martial convened by Major General Thurman E. Anderson to face charges which General Anderson had referred to trial. Appellant pled guilty to wrongful appropriation of nonappropriated funds and to making and submitting false official records. He was sentenced by the commissioned and enlisted members of the court-martial to a bad-conduct discharge, confinement at hard labor for twelve months, forfeiture of all pay and allowances, and reduction to Private E-1. General Anderson approved the findings and the sentence on 14 December

1982. The case was reviewed by a panel of this Court which affirmed the findings of guilty and a portion of the approved sentence. *United States v. Treakle*, C.M. 443599 (A.C.M.R. 19 Aug. 1983) (unpub.). Appellant then petitioned for review by the United States Court of Military Appeals, alleging for the first time that he had been prejudiced by unlawful command influence. On motion of the Government, the United States Court of Military Appeals remanded the case to us. At the suggestion of the panel of this Court to which the case was returned, we accepted the case for decision *en banc.*[1] Appellate counsel have provided us with exhaustive briefs, voluminous evidence, and oral arguments.

We affirm the findings of guilty based on appellant's provident pleas of guilty. We set aside the sentence and authorize a rehearing based on a finding of unlawful command influence.

## II. *The Facts*

General Anderson assumed command of the 3d Armored Division on 19 February 1982. On 13 April 1982 he spoke at a meeting with his subordinate commanders and senior noncommissioned officers at which he addressed, among other topics, the subject of testimony on behalf of soldiers at court-martial. This subject was mentioned in at least ten such meetings through December 1982. The 13 April 1982 meeting included subordinate convening authorities from nondivisional units not under General Anderson's command but within his general court-martial jurisdiction.[2]

Prior to the 13 April 1982 meeting, the Division Staff Judge Advocate, Lieutenant Colonel John R. Bozeman, prepared a summary of legal topics which General Anderson wanted to discuss. In pertinent part, the summary was as follows:

*Command influence.*

a. Do what you think is right; have the courage to stand behind your decisions (whether to prefer charges; what level of disposition to recommend).

b. Inquiries about incidents on the blotter do not indicate the CG is dictating a course of action. Get this point to company-level commanders.

\* \* \* \* \* \*

*Witnesses on extenuation and mitigation.*

a. Common scenario: serious offense at BCD level; company commander testifies that soldier (can be rehabilitated) (should not be discharged) (should not be confined) (should be returned to the unit 'this afternoon').

b. Apprise company level commanders of the general inconsistency of recommending a GCM or BCD and discharge of the accused from the service, and then testifying to the effect that the accused should be retained.

c. *CAUTION:* These remarks don't mean don't testify for one of your soldiers or tell a subordinate not to testify. It is occasionally appropriate to seek a result that an otherwise good soldier will be placed under a suspended punitive discharge. If retention in the service is appropriate, maybe you've recommended the wrong level of disposition.

Colonel Bozeman was present at the 13 April 1982 meeting and two or three other meetings at which General Anderson spoke on this subject, but was absent from the majority of such meetings. He apparently foresaw no difficulties arising from the

---

1. We are cognizant of the holding in *United States v. Chilcote*, 20 U.S.C.M.A. 283, 43 C.M.R. 123 (1971), which proscribed *en banc* reconsideration of the decision of a panel of a Court of Military Review. The case at bar does not fall within the holding of *Chilcote* since the panel of this Court which originally reviewed this case did not consider the issues we address. *See United States v. Roettger*, 16 M.J. 536 (A.C.M.R. 1983), *rev'd on other grounds*, 17 M.J. 453 (C.M.A.1984).

2. The general court-martial jurisdiction of the Commander, 3d Armored Division, is defined by geographic limits. He acts as the general court-martial convening authority for all troops within his designated geographic area. Army Reg. 27–10, USAREUR Supplement 1, App. F, Military Justice Related Policy and Procedures, paras. 9*l* and 10*d* (1) at 17–18 (1978).

general's remarks, for he neither took nor recommended remedial action until early in 1983, after publication of the Division Command Sergeant Major's letter discussed below.

■ During an interview with several defense counsel and in sworn testimony at the trial of *United States v. Giarratano*,[3] General Anderson said that he had been concerned by cases in which subordinate commanders had recommended trial by general or bad-conduct discharge special courts-martial, then testified during sentencing proceedings that the accused was a "good soldier" who should not be discharged. Although the general could not recall his comments precisely because he did not use a prepared text, he said his message to his subordinates centered on "consistency" and contained two basic points: that a commander should recommend a lower level court-martial if he does not believe the accused should be discharged; and that in sentencing proceedings a commander should not testify that the accused is a "good soldier" or recommend retention if he believes the accused should be discharged. General Anderson recalled stressing this theme of consistency between recommendations for disposition and testimony and "hoped" that he had also stressed the obligation to testify truthfully. Finally, the general explained that he conveyed the same message to noncommissioned officers on the premise that they typically participate in the commander's decision on disposition of charges and presumably share his opinion of the soldier in question.

Those who heard General Anderson speak report widely different perceptions of his message.

Nine battalion commanders agreed that General Anderson stressed the inconsistency of recommending trial before a discharge-level court-martial, then testifying that the accused should be retained in the Army. One battalion commander's summary, taken from his contemporaneous notes, was that the general "took a dim view of the chain of command coming into a court-martial and offering testimony on behalf of the accused when the chain of command themselves had been the ones that had referred the whole case to the court." Some understood General Anderson to be encouraging recommendations for lower-level courts-martial when the commander felt the accused should be retained. Others understood him to be discouraging favorable character testimony once a recommendation had been made for trial by a court-martial empowered to adjudge a punitive discharge.

Evidence from company commanders showed a similar diversity of perception. All agreed on hearing the consistency theme, which this group generally understood as discouraging lower-level referral recommendations. One company commander's summary was that General Anderson "was tired of officers and noncommissioned officers preferring charges against soldiers, bringing them to court and then giving testimony as to their good character." Some said they understood the general to refer only to testimony after findings. Others did not mention hearing such a limitation.

Evidence from senior noncommissioned officers revealed the widest diversity of perception. Some understood General Anderson to be discouraging favorable character testimony by noncommissioned officers before discharge-level courts-martial—the "consistency" theme. For example, "Don't

---

**3.** S.P.C.M. 20588, tried during the period 12 October—10 December 1983. On motion of appellate defense counsel the transcript of testimony and the documentary exhibits compiled in a lengthy motions hearing at Giarratano's trial were admitted as an appellate exhibit in this case. Citing *United States v. Karlson,* 16 M.J. 469 (C.M.A.1983), and *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967), appel-

lant argues that this evidence, and the numerous affidavits which also have been admitted on his motion, can only be used to raise issues or decide the case in his favor. Our disposition moots this issue. In any event, we do not understand *Karlson* or *DuBay* to preclude us from considering evidence offered by appellant, or to preclude us from making findings of fact where the evidence is free of substantial dispute.

recommend guys for court-martial, send them up there, and turn right around and be a character reference for them, saying they're good guys." Some understood the general's policy to be more direct—that noncommissioned officers should testify in support of their commanders' recommendations. For example, "[If] the commander... preferred charges against a soldier... then NCO's, particularly NCO's in that chain of command, should support him." A few senior noncommissioned officers specifically stated that General Anderson had discouraged favorable character evidence both before and after findings.

Many who attended these meetings also understood General Anderson to be prescribing a mandatory definition for the phrase "good soldier", a definition which did not include those guilty of serious offenses. For example, "[H]e had difficulty understanding why senior NCO's, people in key positions, could go in and testify on soldiers being good soldiers... when they had just been convicted of serious crimes...."

Many of the people who heard General Anderson's comments recalled that he said these situations made him angry and that he expressed anger by his demeanor as well. Nearly everyone who heard him took his message seriously. Many of those who understood the general to be discouraging favorable character testimony believed that such a policy was morally and legally wrong. Some were deeply troubled by what they believed the general had said. Some felt an implied threat and feared reprisal for those who did not comply.

Many commanders and noncommissioned officers relayed their various understandings of General Anderson's policies through command and noncommissioned officer channels and the subject was a topic of discussion within the 3d Armored Division. However, each of the witnesses who specifically stated that he understood the general's policy to include pre-findings testimony also said that he had not repeated that version of the general's comments.

On 25 January 1983, after the trial of appellant's case, the situation was aggravated by division-wide distribution of a letter from the Division Command Sergeant Major. This letter contained the statement that, "Noncommissioned Officers DON'T: ... Stand before a court-martial jury or an administrative elimination board and state that even though the accused raped a woman or sold drugs, he is still a good soldier on duty." Within the division's Second Brigade, the situation was also aggravated by the distribution, on 7 December 1982, of the following guidance from the Brigade Command Sergeant Major:

> Once a soldier has been "convicted", he then is a convicted criminal. There is no way he can be called a "good soldier" even though up until the day he's court martialed he is a super star.

> The NCO Corps does not support "convicted criminals." We are ruthless and unrelenting in our pursuit of law and order and fully accept our role in upholding the moral ethics and principles upon which our nation is founded.

> If you personally cannot subscribe to this philosophy my friend, you need to leave the Army and find another occupation in life.

On 28 February 1983, the letter from the Division Command Sergeant Major was, for the first time, brought to the attention of Colonel Bozeman, who immediately realized its potential for unlawful command influence. From an interview with the command sergeant major on 1 March 1983, the staff judge advocate learned that not only had the letter been published without legal review, but also that General Anderson had neither seen it nor approved its release. When the staff judge advocate advised the general of the problem that same day by having him read the letter, the general's unprompted reaction was two-fold: first, that the letter was improper because it advised its readers not to testify favorably for convicted persons; second, that immediate corrective action was needed.

In succeeding weeks, pursuant to General Anderson's direction, the following ac-

tions were taken. Attempts were made to stop further distribution of the letter. The staff judge advocate personally called subordinate commanders to advise them to disregard the letter and to expect a written retraction. At meetings with subordinate commanders and senior noncommissioned officers on three occasions (20 March 1983, 30 March 1983 and 13 June 1983), the general emphasized that there was no policy against testifying favorably for accused persons at courts-martial and that any such impression created by previous statements or letters was erroneous. He also emphasized that there was a moral and legal obligation to testify favorably. The Division Command Sergeant Major met with senior noncommissioned officers on 10 March 1983 and advised them to disregard that part of his letter involving testifying at courts-martial. At all of these meetings, the staff judge advocate personally reinforced these comments. On 14 March 1983, General Anderson allowed himself to be interviewed under oath by all defense counsel serving the 3d Armored Division in order to explain the nature of his remarks.

On 4 March 1983, General Anderson issued a command letter in which he stated the following:

1. Let's all understand several rules related to testifying on behalf of an accused soldier.

2. At courts-martial or administrative elimination proceedings, an accused soldier has an absolute right to have available witnesses, if any, testify about his or her good conduct, reputation or record for efficiency, or any trait desirable in a good soldier. Stated another way, if a witness has information favorable to the accused soldier and useful to the court-martial or elimination board in determining an appropriate sentence or recommendation, that witness is duty-bound to provide testimony to that effect. Indeed, to go a step further, I believe that the witness ought to take the initiative to let the accused soldier or his defense counsel know what information he has.

On 8 March 1983, the Division Command Sergeant Major also published a letter which rescinded his letter of 25 January 1983 and substituted corrective guidance with respect to testifying at courts-martial. Paragraph 2 of the general's letter of 4 March was quoted within the command sergeant major's letter.

General Anderson and Colonel Bozeman both testified that General Anderson very carefully considered extenuation and mitigation evidence, including favorable character evidence, before referral and during post-trial review of court-martial cases. Colonel Bozeman recounted a number of instances in which the general had, based on evidence in extenuation or mitigation, directed significantly more lenient disposition of cases than that recommended by his subordinates, approved pretrial agreements more generous than those proposed by the accused, or reduced adjudged sentences below the level required by pretrial agreements.

We have considered all the evidence in this case, including that cited in the dissent. We are convinced that although General Anderson acted in good faith and intended his remarks to promote appropriate recommendations, numerous commanders and senior noncommissioned officers perceived his remarks as discouraging favorable character testimony, and some understood his comments to apply to prefindings as well as presentencing testimony. We are also convinced that under the circumstances it was reasonable for members of the general's audience to reach these conclusions. The consequences of these perceptions are therefore the responsibility of the general and his staff and, through them, the Government.

 While appellant does not contend that he was deprived of any evidence other than favorable character testimony, we note that some members of the 3d Armored Division have made statements which suggest that they understood General Anderson's comments to mean that they should give no testimony at all for an accused soldier. The number of these individuals is

so small, the interpretation so inconsistent with the thrust and context of the general's remarks, and the weight of contrary interpretations so overwhelming that we do not regard such unwarranted conclusions as a material factor for the disposition of this case. We find that it was unreasonable to conclude from the general's comments that he was addressing anything other than character evidence and we do not construe Article 37(a), Uniform Code of Military Justice,[4] to apply to unreasonable interpretations of a commander's comments.[5]

## III. *Command and Staff Responsibility*

The duties of a division commander as a court-martial convening authority and as the primary leader responsible for discipline within the division are among the most challenging a commander can perform. On the one hand, effective leadership requires a commander to supervise the activities of his subordinates diligently and ensure that state of good order and discipline which is vital to combat effectiveness. On the other hand, he must exercise restraint when overseeing military justice matters to avoid unlawful interference with the discretionary functions his subordinates must perform. The process of maintaining discipline yet ensuring fairness in military justice requires what the United States Court of Military Appeals has called "a delicate balance"[6] in an area filled with perils for the unwary. Many experienced line officers have expressed similar conclusions. Excerpts from two particularly useful and authoritative examples are reproduced in the appendix to this opinion.

■ General Anderson attempted to correct what he perceived to be a command problem. Correction of procedural deficiencies in the military justice system is within the scope of a convening authority's supervisory responsibility.[7] Yet in this area, the band of permissible activity by the commander is narrow, and the risks of overstepping its boundaries are great. Interference with the discretionary functions of subordinates is particularly hazardous. While a commander is not absolutely prohibited from publishing general policies and guidance which may relate to the discretionary military justice functions of his subordinates,[8] several decades of practical experience under the Uniform Code of Military Justice have demonstrated that the risks often outweigh the benefits. The balance between the command problem to be resolved and the risks of transgressing the limits set by the Uniform Code of Military Justice is to be drawn by the commander with the professional assistance of his staff judge advocate. Although the commander is ultimately responsible, both he and his staff judge advocate have a duty to ensure that directives in the area of military justice are accurately stated, clearly understood and properly executed.

■ In this case General Anderson and his staff judge advocate neglected two important principles:

(1) *Announce policies and directives clearly.* General Anderson sought to correct a perceived problem—inconsistency between recommendations that a case be tried by a court capable of adjudging a discharge and testimony that the accused should be retained in the service.[9] Unfor-

---

4. 10 U.S.C. 837(a) (1982).

5. The events outlined above were brought to light primarily through the efforts of members of the United States Army Trial Defense Service, an independent agency with the mission of providing defense services to soldiers. Among those involved, we are particularly impressed with the dedication and professionalism of Captain Stephen R. Kane, then Senior Defense Counsel, Hanau Field Office, United States Army Trial Defense Service.

6. *United States v. Littrice,* 3 U.S.C.M.A. 487, 491, 13 C.M.R. 43, 47 (1953).

7. *See generally* paras. 29–35, 94, 128, Manual for Courts-Martial, United States, 1969 (Revised edition).

8. *United States v. Littrice,* 3 U.S.C.M.A. at 491–93, 13 C.M.R. at 47–49.

9. Paragraphs 30*g* and 33*h*, Manual for Courts-Martial, United States, 1969 (Revised edition), state the general requirement that charges

tunately, he sought to disseminate his policy of "consistency" through partly extemporaneous comments to large audiences rather than publishing his guidance in writing. Earlier the staff judge advocate had provided the general with a point paper which included a cautionary warning to ensure that the general did not convey the impression that one should not testify for accused soldiers. The subtle and somewhat contradictory nature of the points in that paper resulted in a message which was simply too complex for successful transmission to a large audience via verbal comments. The resulting confusion was increased by the tone and demeanor the general projected and by the fact that on some occasions he omitted the cautionary comment recommended by his staff judge advocate.

(2) *Follow up to see that directives are correctly understood and properly executed.* Neither the general nor his staff judge advocate took steps to determine what the members of the 3d Armored Division were gleaning from his comments in this highly sensitive area or what effect his remarks were having on the military justice process. No one in the audience was asked his understanding of the general's message. Trial and defense counsel were not alerted to watch for signs that witnesses were being improperly influenced. The staff judge advocate was absent from many of the meetings at which the general spoke and could not monitor the clarity and effect of the general's delivery. No record was made of what the general actually said.

We now turn to the legal consequences.

## IV. *The Findings*

Appellant contends that the findings of guilty, which were based on appellant's

should be referred to "the lowest court that has power to adjudge an appropriate and adequate sentence." Thus General Anderson's concern with appropriate referral recommendations was a legitimate command interest.

10. *United States v. Treakle,* CM 443599 (A.C. M.R. 19 Aug. 1983) (unpub.).

otherwise provident pleas of guilty,[10] should be set aside. The grounds urged by appellant are: (1) disqualification of the convening authority from referring the charges to trial because of an injudicious attitude or because he was an accuser within the terms of Article 1(9), Uniform Code of Military Justice,[11] (2) unlawful influence on the exercise of independent judgment by the accuser and commanders forwarding charges; and, (3) improvidence of appellant's plea of guilty because of deprivation of favorable character evidence.

### A. Disqualification of Convening Authority

 We do not agree with appellant's contention that a convening authority can be deprived of his statutory power to convene courts-martial and refer charges to trial based on lack of judicial temperament. The cases cited by appellant for the proposition [12] offer no direct support and dubious inferential support. Nothing in the Uniform Code of Military Justice suggests that Congress entertained such a concept. To the contrary, the statutory scheme and legislative history of the Uniform Code of Military Justice indicate to us that Congress endowed commanders described in Articles 22, 23 and 24 of the Uniform Code of Military Justice [13] with military justice powers intending that the Executive should determine who should exercise those powers. To check the exercise of these powers, Congress endowed the courts created by the Uniform Code of Military Justice with the power to grant relief in individual cases where an abuse of command authority has taken place. We view this system as an integral feature of the balance struck

11. 10 U.S.C. 801(9) (1982).

12. *United States v. Lynch,* 9 U.S.C.M.A. 523, 26 C.M.R. 303 (1958); *United States v. Daniels,* 27 C.M.R. 515, *opinion on reconsideration,* 27 C.M.R. 527 (A.B.R.1958).

13. 10 U.S.C. 822, 823, 824 (1982).

by Congress between command functions and the administration of military justice.[14]

Even if appellant's theory of disqualification because of an injudicious attitude were valid, that theory would not apply to the case at bar, as we have found that General Anderson's actions were marked by confusing communication rather than deliberate attempts to pervert the military justice system. The evidence simply does not reveal an attitude or temperament which would satisfy any rational test which might be devised to implement such a theory of disqualification.[15]

■ As to the second ground on which appellant urges General Anderson's disqualification, *i.e.*, that he was an accuser within the meaning of Article 1(9), Uniform Code of Military Justice, the established test is whether a convening authority has a "personal"[16] or "other than official"[17] interest in a case. We have no evidence that General Anderson had ever heard of appellant before the charges in this case were presented to him for referral. There is no evidence that the general was affected in any capacity other than his official capacity by appellant, appellant's offenses, or offenses of a similar nature. Accordingly, he was not an accuser and on that basis was not disqualified from participating in the referral process.

### B. Independent Judgment

■ As noted above, General Anderson's comments about referral recommendations were clearly proper and tended to benefit accused soldiers by encouraging lower-level referrals. The improper portion of the general's comments addressed the testimony of potential witnesses. No evidence before us indicates that the improper portion of the general's comments had any effect on any subordinate's decision to swear to charges or to recommend a particular disposition of any charges. Notably absent is any evidence that any accuser or forwarding authority even considered the improper portion of the general's comments in connection with his performance of those functions.[18] Considering the evidence, which showed a long course of embezzlement of over $7,000.00 in funds held for the benefit of the members of appellant's unit and the submission of numerous false records, the actions and recommendations of the chain of command were exactly what one would expect. Appellant's contention—that he was deprived of the exercise of independent judgment by the person who swore to the charges against him and the commanders who recommended disposition of those charges—rests on speculation contradicted by the circumstances of the case, is not fairly raised by the evidence, and must fail.[19]

---

**14.** See *Curry v. Secretary of Army,* 595 F.2d 873, 879–81 (D.C.Cir.1979); *see generally Uniform Code of Military Justice: Hearings on H.R. 2498 Before a Subcomm. of the House Comm. on Armed Services,* 81st Cong., 1st Sess. 606 (1949).

**15.** See *United States v. Crawley,* 6 M.J. 811, 813 (A.F.C.M.R.1978), *pet. denied,* 7 M.J. 67 (C.M.A. 1979); *cf. Cooke v. Orser,* 12 M.J. 335 (C.M.A. 1982) (convening authority cannot abdicate his prosecutorial responsibilities); *United States v. Hardin,* 7 M.J. 399 (C.M.A.1979) (referral process is essentially prosecutorial in nature).

**16.** *United States v. Crossley,* 10 M.J. 376, 378 (C.M.A.1981); *Brookins v. Cullins,* 23 U.S.C.M.A. 216, 218, 49 C.M.R. 5, 7 (1974); *United States v. Gordon,* 1 U.S.C.M.A. 255, 259–62, 2 C.M.R. 161, 165–68 (1952).

**17.** *United States v. Conn,* 6 M.J. 351, 354 (C.M.A. 1979).

**18.** *Cf. United States v. Wood,* 13 U.S.C.M.A. 217, 223–24, 32 C.M.R. 217, 223–24 (1962) (circumstances did not indicate unlawful command influence where court members could not recall policy letter).

**19.** *Compare United States v. Smith,* 1 M.J. 1204 (N.C.M.R.1977) (convening authority's statements to subordinates condemning recruit maltreatment could not be reasonably construed as unlawful command influence), *pet. denied,* 3 M.J. 165 (C.M.A.1977) *with United States v. Hawthorne,* 7 U.S.C.M.A. 293, 22 C.M.R. 83 (1956) (rehearing ordered when company commander based recommendation for court-martial on policy letter); *United States v. Doherty,* 5 U.S.C.M.A. 287, 17 C.M.R. 287 (1954) (reconsider sentence when convening authority approved bad-conduct discharge because of Navy policy); *United States v. Charleson,* 26 C.M.R. 630 (A.B. R.1958) (reassess sentence when company commander's decision to recommend court-martial

## C. Providence of Pleas

■ Appellant was the manager of a unit lounge. During an inventory and audit of the lounge, it was discovered and documented that appellant had embezzled nonappropriated funds from the lounge and had made and submitted false official documents to conceal his activities. This prompted appellant to voluntarily approach his battery commander and confess. Appellant was then charged with fifteen separate specifications alleging making and presenting false official records, larceny of $7,413.00 in nonappropriated funds, and delivering an amount less than called for by a receipt, violations of Articles 107, 121 and 132, Uniform Code of Military Justice,[20] respectively. Prior to trial appellant offered to waive a pretrial investigation[21] and to plead guilty to wrongful appropriation of $4,000.00 and one specification of making and presenting false official records. In return, appellant sought the convening authority's agreement to direct the trial counsel to present no evidence of larceny and no evidence on the Article 132 charge and to suspend execution of any fine adjudged by the court. This offer was accepted and at trial appellant entered guilty pleas consistent with the pretrial agreement. Appellant's pleas were accepted after a thorough providence inquiry. In sworn testimony, appellant stated that he had entered his pleas of guilty in order to "accept [his] punishment," "right the wrong that [he] had done", "begin that long process of redeeming [himself]", and "serve as a positive example to the other troops, both NCO's and below"—in other words, to satisfy his conscience and demonstrate his rehabilitative potential.

Appellant requests that we set aside the findings of guilty. Appellant does not contend that General Anderson exerted any pressure on appellant to plead guilty. Indeed, he asserts that he was unaware of the general's comments and of any effect

they may have had on anyone. What appellant does contend is: (1) that General Anderson's comments deprived him of some favorable character witnesses; (2) that the absence of these witnesses affected his determination whether to defend on the basis of good character and his determination of what plea bargain was acceptable; and, (3) that therefore his pleas of guilty were improvident. Stripped to its essence, appellant's contention is that his pleas were improvident because the missing character witnesses created a misapprehension on his part about the strength of the defense he could present.

We find that appellant's plea decision was not influenced by a lack of character witnesses.

### 1. *Deprivation of Witnesses*

■ Article 37(a), Uniform Code of Military Justice,[22] provides:

No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding. No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts. The foregoing provisions of the subsection shall not apply with respect to (1) general instructional or informational courses in military justice if such courses are designed solely for the purpose of instructing members of a command in the substantive and procedural aspects of courts-martial, or

had been influenced by battalion executive officer).

**20.** 10 U.S.C. 907, 921, 932 (1982).

**21.** Article 32, Uniform Code of Military Justice, 10 U.S.C. 832 (1982).

**22.** 10 U.S.C. 837(a) (1982).

(2) to statements and instructions given in open court by the military judge, president of a special court-martial, or counsel.

We hold that the portion of Article 37, 10 U.S.C. § 837 which forbids coercion or unauthorized influence on the action of a court-martial prohibits coercion or unauthorized influence on actual or prospective witnesses with respect to the content of their testimony.[23]

While we have no direct evidence that anyone who could have given favorable character testimony for appellant was influenced by General Anderson's comments, those comments were, as noted above, reasonably understood by many persons to discourage such testimony and by some to discourage such testimony on the merits as well as during sentencing proceedings.

 A finding that unlawful pressure has been brought to bear in violation of Article 37 triggers a rebuttable presumption that the recipient of the unlawful pressure was in fact influenced.[24] As we construe this presumption of prejudice, the target and the content of the unlawful pressure define the nature and extent of the presumed influence and the resulting prejudice. The presumption may be rebutted only by clear and positive evidence.[25] Consequently, if any prospective character witness for appellant directly or indirectly heard General Anderson's message and reasonably understood him to be discouraging favorable character testimony, that unlawful pressure would trigger a rebuttable presumption that the witness was in fact influenced not to give favorable character testimony.

In this case, appellant's battery commander, first sergeant, former chief of firing battery, another supervisor and a former subordinate gave favorable character testimony for appellant during the sentenc-

ing phase of the trial. This fact is persuasive evidence that appellant was not deprived of favorable character evidence by General Anderson's comments, but we need not and do not decide this question. We will assume that he was.

## 2. *Effect on Guilty Pleas*

 Notwithstanding the assumption that appellant was deprived of favorable character evidence, it does not automatically follow that appellant's pleas of guilty were improvident. Whether appellant was prejudiced with respect to his pleas of guilty depends on whether the assumed deprivation of character witnesses caused a misapprehension which was a substantial factor in his decision to plead guilty.

[A] substantial misapprehension ... may vitiate the providence of a plea of guilty.... All the circumstances presented by the record must be considered to determine whether [the] misapprehension ... affected the providence of guilty pleas.... Our own examination of the record convinces us that appellant's misapprehension... was an insubstantial factor in his decision to plead guilty.... [I]n appellant's negotiation of the pretrial agreement, the [misapprehension] did not affect his willingness to plead guilty.[26]

The fact that a witness or witnesses declined to give favorable character testimony, and thus created a misapprehension about the state of the evidence, does not by itself indicate that the misapprehension was a substantial factor in the plea decision. The decision to enter a negotiated plea of guilty is highly personal. Any of a wide variety of factors may dictate a given plea decision; any particular circumstance, including the availability of character witnesses, may be immaterial to a given accused. We have no evidence from any source which suggests that the unavailabil-

23. *See United States v. Rosser*, 6 M.J. 267 (C.M.A.1979).

24. *See generally United States v. Johnson*, 14 U.S.C.M.A. 548, 34 C.M.R. 328 (1964).

25. *United States v. Rosser*, 6 M.J. at 272.

26. *United States v. Walls*, 9 M.J. 88, 90–92 (C.M.A.1980). *See also United States v. Hunt*, 10 M.J. 222 (C.M.A.1981); *United States v. Logan*, 22 U.S.C.M.A. 349, 47 C.M.R. 1 (1973).

ity of additional character witnesses was a substantial factor in appellant's plea decision. The prospect that appellant might have proceeded differently is thus theoretical and speculative only.

Conversely, the fact that appellant would have been limited on the merits to evidence of relevant traits of character [27] and by practical and legal considerations of cumulativeness [28] indicates that it was not a substantial factor. In addition, all of the evidence in the record of trial points to a plea of guilty which was the product of strong evidence of guilt in the hands of the prosecutor, the commands of a troubled conscience, a desire for the protection of a pretrial agreement and an appreciation of the mitigating value of a plea of guilty. Based on this clear and positive evidence, we find that appellant would have entered his negotiated plea with or without additional character evidence and that his pleas of guilty were provident. The resulting findings must stand.

## V. *The Sentence*

█ Among those who heard General Anderson speak was a member of appellant's court-martial. His perception of the general's message was:

> [Y]ou will not go to court and state that [a convicted soldier] is a good soldier; no matter how good the soldier's performance was prior to the court-martial, you would not state that "you would like to have this soldier remain in the Army," and that you would be willing to serve with this soldier in combat.

The member has denied being influenced by General Anderson's perceived policies. The sincerity and the subjective truthfulness of his denial are evident.

Article 37(a), Uniform Code of Military Justice,[29] forbids coercion or unauthorized

influence on the deliberations of members of a court-martial.[30] The comments attributed to General Anderson by the member in question dealt with potential witnesses, not members of a court-martial. Nevertheless, when considered from the perspective of a court-martial member, the logical inference is that evidence of the accused's good duty performance and soldierly qualities should be discounted and that retention of a convicted accused is inappropriate. We conclude that the member in question drew that inference and understood it to be General Anderson's policy for court-martial members. By the time appellant's case was tried, the general's message had been widely disseminated within the 3d Armored Division, but no remedial measures had been undertaken. This circumstance creates at least the appearance that the other members of appellant's court-martial who were assigned to the 3d Armored Division had also heard the general's message, understood him to be discouraging favorable character testimony, and drew the same inference.

As noted above, when such unlawful pressure has or appears to have been brought to bear on a member of a court-martial, the law presumes that the member was in fact influenced. This presumption is rebuttable by clear and positive evidence that no actual influence occurred. Standing alone, a member's denial that he was influenced is ordinarily insufficient to rebut the presumption.[31]

█ In this case the evidence is insufficient to rebut the presumption that the members in question were in fact influenced by General Anderson's comments. Appellant's sentence included a bad-conduct discharge, confinement at hard labor

---

**27.** Mil.R.Evid. 404.

**28.** Mil.R.Evid. 403.

**29.** 10 U.S.C. 837(a) (1982).

**30.** *See United States v. Olson,* 11 U.S.C.M.A. 286, 29 C.M.R. 102 (1960); *United States v. Estrada,* 7 U.S.C.M.A. 635, 23 C.M.R. 99 (1957); *United States v. Littrice,* 3 U.S.C.M.A. 487, 13 C.M.R. 43

(1953); *United States v. Olivas,* 26 C.M.R. 686 (A.B.R.1958).

**31.** *United States v. Cole,* 17 U.S.C.M.A. 296, 297–98, 38 C.M.R. 94, 95–96 (1967); *United States v. Kitchens,* 12 U.S.C.M.A. 589, 693, 31 C.M.R. 175, 179 (1961); *United States v. Zagar,* 5 U.S.C.M.A. 410, 414, 18 C.M.R. 34, 38 (1955); *United States v. Toon,* 48 C.M.R. 139, 143 (A.C.M.R.1973).

for twelve months, forfeiture of all pay and allowances, and reduction to Private E–1. The punitive discharge is consistent, rather than inconsistent, with actual influence on the sentence and tends to confirm rather than rebut the presumption that the members were in fact influenced. We cannot say that the sentence as a whole, viewed in the context of the entire case, clearly rebuts the presumption of actual influence on the sentence. We have no other evidence which is relevant to the presence or absence of actual influence. The nature of the presumed influence is such that prejudice as to the sentence is apparent.

The Government has argued that we should order a hearing [32] to allow further litigation of this issue. At such a hearing the parties would presumably explore such relevant questions as: (1) whether the other members had heard General Anderson's message and if so, what they understood the general's policies to be; (2) whether any member recalled or considered these policies during appellant's trial; (3) whether any member in fact drew the inference described above; (4) whether General Anderson's policies were discussed by the members during deliberations or at any time during appellant's trial; and, (5) whether any member was actually influenced in deciding appellant's sentence.

In the case at bar, we have answers to enough of the relevant questions to render such a hearing superfluous. The member in question has affirmed that his perception of General Anderson's policies was discussed by the members during appellant's trial. Affidavits from other members corroborate this information. The sentence must be set aside.

## VI. *Disposition*

Our consideration of this case has not been limited to the issues discussed above. We have examined each stage in the processing and disposition of the charges. In addition, we have considered the total effect of General Anderson's comments to determine whether appellant's case is free from prejudice brought about by unlawful command influence and to determine whether appellant's case presents the appearance of fairness.[33] We are satisfied that appellant has suffered no prejudice unredressed by the remedy we direct. We are also satisfied that this remedy eradicates any appearance of unfairness in appellant's case.

The findings of guilty are affirmed. The sentence is set aside. A rehearing on the sentence may be ordered.

Chief Judge HANSEN, Senior Judges MOUNTS, McKAY and SUBROWN and Judge WERNER concur.

Judge COKER was present for oral argument but did not participate in the decision of this case.

Judges WATKINS, BADAMI and BROOKSHIRE did not participate in the decision of this case.

## APPENDIX TO THE OPINION OF THE MAJORITY

Excerpts from a letter which the Powell Committee recommended The Judge Advocate General of the Army send to officers newly appointed as general court-martial convening authorities.

Dear :

Because it is of the utmost importance that commanders maintain the confidence of the military and the public alike in the Army military justice system, the following suggestions are offered you as a commander who has recently become a general court-martial convening authority, in the hope that they will aid you in the successful accomplishment of your military functions and your over-all command mission.

\* \* \* \* \* \*

---

**32.** *See United States v. Ray,* 20 U.S.C.M.A. 331, 43 C.M.R. 171 (1971); *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967).

**33.** *Cf. United States v. Rosser,* 6 M.J. at 272 (total effect of unlawful conduct considered to ascertain extent of prejudice and appearance of fairness).

A serious danger in the administration of military justice is illegal command influence. Congress, in enacting the Uniform Code of Military Justice, sought to comply with what it regarded as a public mandate, growing out of World War II, to prevent undue command influence, and that idea pervades the entire legislation. It is an easy matter for a convening authority to exceed the bounds of his legitimate command functions and to fall into the practice of exercising undue command influence. In the event that you should consider it necessary to issue a directive designed to control the disposition of cases at lower echelons, it should be directed to officers of the command generally and should provide for exceptions and individual consideration of every case on the basis of its own circumstances or merits. For example, directives which could be interpreted as requiring that all cases of a certain type, such as larceny or prolonged absence without leave, or all cases involving a certain category of offenders, such as repeated offenders or offenses involving officers, be recommended or referred for trial by general court-martial, must be avoided. This type of directive has been condemned as illegal by the United States Court of Military Appeals because it is calculated to interfere with the exercise of the independent personal discretion of commanders subordinate to you in recommending such disposition of each individual case as they conclude is appropriate, based upon all the circumstances of the particular case. The accused's right to the exercise of that unbiased discretion is a valuable pretrial right which must be protected. *All pretrial directives, orientations, and instructions should be in writing and, if not initiated or conducted by the staff judge advocate, should be approved and monitored by him.*

\* \* \* \* \* \*

The results of court-martial trials may not always be pleasing, particularly when it may appear that an acquittal is unjustified or a sentence inadequate.

Results like these, however, are to be expected on occasion. Courts-martial, like other human institutions, are not infallible and they make mistakes. In any event, the Uniform Code prohibits censuring or admonishing court members, counsel, or the law officer with respect to the exercise of their judicial functions. My suggestion is that, like the balls and strikes of an umpire, a court's findings or sentence which may not be to your liking be taken as 'one of those things.' Courts have the legal right and duty to make their findings and sentences unfettered by prior improper instruction or later coercion or censure.

Committee on the Uniform Code of Military Justice, *Good Order and Discipline in the Army: Report to Honorable Wilber M. Bruckner, Secretary to the Army,* 17–21 (18 Jan 1960) (emphasis added).

Excerpts from an article by General William C. Westmoreland discussing the relationship of military justice to good order and discipline in the Army.

As a soldier and former commander, and now as Chief of Staff of the Army, I appreciate the need for a workable system of military justice. Military commanders continue to rely on this system to guarantee justice to the individual and preserve law and order within the military.

\* \* \* \* \* \*

An effective system of military justice must provide the commander with the authority and means needed to discharge efficiently his responsibilities for developing and maintaining good order and discipline within his organization. Learning and developing military discipline is little different from learning any discipline, behavioral pattern, skill, or precept. In all, correction of individuals is indispensable.... The military commander should have the widest possible authority to use measures to correct individuals, but some types of corrective action are so severe that they should not be entrusted solely to the discretion of the

commander. At some point he must bring into play judicial processes. At this point the sole concern should be to accomplish justice under the law, justice not only to the individual but to the Army and society as well.

I do not mean to imply that justice should be meted out by the commander who refers a case to trial or by anyone not duly constituted to fulfill a judicial role. A military trial should not have a dual function as an instrument of discipline and as an instrument of justice. It should be an instrument of justice and in fulfilling this function, it will promote discipline.

The protection of individual human rights is more than ever a central issue within our society today. An effective system of military justice, therefore, must provide of necessity practical checks and balances to assure protection of the rights of individuals. It must prevent abuses of punitive powers, and it should promote the confidence of military personnel and the general public in its overall fairness. It should set an example of efficient and enlightened disposition of criminal charges within the framework of American legal principles. Military justice should be efficient, speedy, and fair.

Westmoreland, *Military Justice—A Commander's Viewpoint*, 10 Am.Crim.L.Rev. 5, 5–8 (1971).

NAUGHTON, Judge, concurring:

I agree with the majority's analysis and disposition in this case with respect to sentence. I write separately to emphasize that, while I agree with the majority's disposition as to findings, I do not view the majority opinion as establishing any analytical model for determining whether a guilty plea is provident when unlawful command influence extends to the findings portion of a trial. My reading of the majority opinion is that under the circumstances of this case appellant's pleas of guilty are provident whether analyzed under the law of unlawful command influence or under the law governing the providence of a plea of guilty.

In my opinion, *United States v. Johnson*, 14 U.S.C.M.A. 548, 34 C.M.R. 328 (1964), establishes the framework for analyzing a case involving unlawful command influence. The analysis is based upon the principle that the appearance of unlawful command influence is as much a threat to the integrity of military justice as its actual existence. *United States v. Johnson*, 14 U.S.C.M.A. at 551, 34 C.M.R. at 331. The appearance or existence of unlawful command influence creates a presumption of prejudice in an accused's favor which may be dispelled only if rebutted "clearly and positively" by the Government. *United States v. Rosser*, 6 M.J. 267, 272 (C.M.A. 1979); *see United States v. Johnson*, 14 U.S.C.M.A. at 551, 34 C.M.R. at 331. The presumption of prejudice in this instance is that such influence tainted the trial's outcome. In many cases, the circumstances of a case, and in particular the target of any attempt at command influence, will focus the presumed adverse effect on only a part of the trial. For example, if the effect can be isolated to sentencing proceedings, there is no need to disturb the findings or subject them to the analysis suggested by *Johnson*. On the other hand, if the effect cannot be isolated, the other phases of the trial or the whole military justice process itself, from preferral through review and action, may be subject to scrutiny.

In this case the reasonable implication of General Anderson's remarks, as described in the majority opinion and as perceived by his subordinates, was to discourage favorable character testimony. This interpretation of General Anderson's remarks was not limited to favorable character testimony on sentencing but extended to findings.

Since the effects of General Anderson's remarks extend to findings, the court must examine their impact on appellant's pleas of guilty. Appellant's contention, reduced to its essence, is that his pleas of guilty were improvident because General Anderson's remarks deprived him of favorable character witnesses and thus created a mis-

apprehension on appellant's part as to the strength of the defense he could present on the merits.

Under traditional providence rules, appellant would have to show that his misapprehension was a substantial factor in his plea decision. *See United States v. Walls,* 9 M.J. 88, 90–92 (C.M.A.1980). Since appellant has not sustained this burden, appellant's pleas of guilty appear to be provident. However, in a case where unlawful command influence is alleged to have affected the findings, our inquiry does not end with testing the providence of a plea of guilty under traditional rules. We must also test appellant's pleas of guilty for the effect, if any, the unlawful command influence had upon it. Because of the presumption of prejudice associated with command influence cases, the Government has the burden of demonstrating by clear and positive evidence that appellant's misapprehension was an insubstantial factor in his decision to plead guilty.

After reviewing the record of trial to determine whether the Government has overcome the presumption of prejudice arising from General Anderson's inappropriate remarks, I am satisfied that the Government has met this burden with respect to findings. As demonstrated by the sentencing portion of appellant's trial, appellant had a number of powerful character witnesses available to him. This fact, coupled with the strength of the Government's case and appellant's consistent expression of a desire to redeem himself, is clear and convincing evidence that appellant's pleas were not tainted by unlawful command influence. In short, under the circumstances of this case, I find no reasonable probability that appellant would have done anything other than plead guilty.

COHEN, Judge, concurring in the result:

I concur with the majority that the accused was prejudiced by the unlawful command influence of Major General Anderson. I also concur in affirming the findings of guilty and setting aside the sentence and permitting a rehearing thereon.

Lastly, I concur with Judge Naughton's analysis of how the rule of presumed prejudice announced in *United States v. Johnson,* 14 U.S.C.M.A. 548, 34 C.M.R. 328 (1964), is to be applied. One reason I do not concur outright with the majority is my concern that one might conclude from their opinion that the effect of General Anderson's comments was limited to its impact upon potential character witnesses and court members. My review of the evidence convinces me that the effect of the general's remarks extended to other participants in the process.

I specifically disassociate myself with the majority's finding that "Unfortunately [the general] sought to disseminate his policy of 'consistency' through *partly extemporaneous* comments to large audiences rather than publishing his guidance in writing." (emphasis added). I find that the general's remarks were not what one would ordinarily consider extemporaneous, despite the fact they were spoken from notes rather than a prepared speech. The evidence conclusively reveals that the statements at issue were the studied, prepared thoughts and policies of a division commander who felt so strongly about them that he repeated them over and over throughout his command and beyond. My conclusions, drawn from the frequency and perceived content of his addresses, are that the general's remarks were a broad criticism of the operation of the military justice system within his command and an expression of his frustration therewith. The portion of his message urging his subordinates to "be consistent" implicitly carried with it the promise that he too would be consistent. The impact of his remarks was felt as strongly by those not in attendance as those who received it firsthand, perhaps more so, as his demeanor was described to them. Since the effects of such an impermissible message can be felt at every stage of the military justice process, each case must be individually scrutinized to ascertain the impact, if any, the general's remarks had in that case.

After careful examination of the available evidence, I am satisfied that the unlawful influence had no prejudicial effect on the process until the sentence stage was reached.

YAWN, Judge, concurring in part and dissenting in part:

I concur in setting aside the sentence in this case but would go further and also set aside the findings. · I fear the majority makes the same error as did the military judge in *United States v. Rosser*, 6 M.J. 267 (C.M.A.1979), by primarily addressing whether the appellant suffered any specific prejudice from the conduct of Major General Anderson and others "without considering the total effect of such conduct on the appearance of fairness and freedom from command influence mandated by Congress and by [Court of Military Appeals'] decisions for court-martial proceedings." *Id.* at 272. My study of the evidence leads me to conclude that there was a conscious and unprecedented assault by General Anderson and members of his command upon the integrity of the military justice system in the 3d Armored Division during his tenure as commander.

I

The General testified that his duties included teaching and training his officers. Accordingly, he delivered a series of instructive lectures to the officers and senior noncommissioned officers of his command on, *inter alia*, their military justice duties and how they must perform some of them.[1] These lectures were given at meetings held at different levels of command and at various locations throughout his division, and the audience varied. Sometimes only commanders were in attendance, and at other times only senior noncommissioned officers. At still other times there was a mix between officers and noncommissioned officers. The exact number of these meetings is uncertain, but they lasted at least

through December 1982 and numbered something more than ten. General Anderson very forcefully stated, at times angrily, that he considered extenuation and mitigation testimony inconsistent with his subordinate commanders' recommendations that the accused be tried by a court-martial empowered to adjudge a punitive discharge. The General testified that he did not intend to discourage favorable testimony on behalf of accused; rather, he meant that an accused's chain of command should devote more thought to their pretrial recommendations. However, too many people received the message that they were not to testify for *any* soldier once charges had been referred against him, and if they did their careers would suffer. In my view, this perception was not limited to good character testimony, as the majority finds. I also believe that the letters written and disseminated by the two command sergeants major accurately reflect their interpretation of the General's policy, and many who read the letters after having heard the General speak thought they were pronouncements of the General's policy. The fact that the Division Command Sergeant Major retracted his first letter and issued another with the offending language excised did nothing, in my opinion, to lessen the harm that letter did. According to one company commander, this retraction was treated as a "joke" in his battalion. Some understood that the guidance announced in the first letter still applied, and the only reason a retraction had been made was because "someone in JAG had read the letter and told the sergeant major he shouldn't say that." The General's command letter, issued nearly one year after he began his series of military justice classes, and five months after the trial of this case, did not alleviate the harm he had done. One command sergeant major testified this letter confused him since there was such a difference in what the General

---

1. I note that Army Regulation 350–212, *Training—Military Justice* (2 June 1972), sets forth the "only" training in military justice service members will receive. Had the regulation been fol-

lowed, this problem of command influence would likely not have arisen. *See also United States v. Isbell*, 3 U.S.C.M.A. 782, 786–87, 14 C.M.R. 200, 204–05 (1954).

had said verbally and what was in the letter.

If the General's lectures were delivered in good faith and were simply misunderstood, he missed a great opportunity to unscramble the situation at a class attended by senior noncommissioned officers when, according to the testimony of one who was there, he was asked what a noncommissioned officer should do if confronted with the following scenario:

"Sir, suppose this was a soldier's first time offense, and this soldier has been in the unit for two years," it's just an example, "and he's never been in no trouble", and all of a sudden he was busted for drugs, or something like this, you know, and then [...], "I come up there for the defense, as a character witness, and I'm asked if he was a good soldier up to that point."

The General did not respond to this question.

General Anderson may well not have understood the legal significance of his actions, but I am convinced he knew what he was doing: beginning in April 1982, he set out to preclude favorable testimony in extenuation and mitigation for soldiers convicted of serious offenses, and he apparently was assisted in this by his Staff Judge Advocate. Testimony given by an officer of the Judge Advocate General's Corps in charge of one of the division's law centers confirms the Staff Judge Advocate's role in this. This officer said he had learned of the Staff Judge Advocate's concern about extenuation and mitigation testimony during a conversation he had had with him; as a result, he was "prompted" to teach an Officer's Professional Development Class on this subject sometime in September 1982. One officer who attended this class said it was about testimony by an accused's chain of command before sentencing and had been given from the prosecutor's viewpoint. He said the class was "mildly oriented towards not having members of a convicted soldier's chain of command testify for him at trial." He also noted that the

idea was that one should think long and hard before going into court and just saying the soldier was a great soldier without considering the seriousness of the offense. The seriousness of the offense should be considered before even going into the court-martial to testify since a reliable member from the chain of command testifying for the accused might help keep the soldier in the unit or Army.

The judge advocate instructor's recollection was not inconsistent with this view. According to him, the Staff Judge Advocate perceived that "people were testifying apparently out of blind loyalty that comes from being a part of a cohesive military unit and that they weren't pausing to give consideration to all of the other facts and circumstances, unique facts and circumstances that bear on a court-martial." This judge advocate testified that he felt there "was a danger to the integrity of the military justice system in that we had witnesses who were offering themselves up as professional noncommissioned officers and officers offering the fact-finder, dressed in their officer clothing, professional judgments in a vacuum. I think that is poor professional conduct."

I see the evidence in this case as much more menacing than does the majority. One of the battalion commanders testified that he did not repeat the General's guidance to his units because he did not think it was good policy. Another said some of the people who heard the General had trouble with what he said, and still another said he could see where some might have gotten the wrong impression from the General's remarks. There is evidence from one of the court members that these remarks were hot topics of "gossip" during the time period appellant was tried. One lieutenant colonel said he felt anxiety about testifying as to what the General said, fearful he might be taken as a troublemaker.

Ten captains, most of them company commanders, gave evidence about their attendance at one or more of the General's meetings. Most of these captains detected

an ominous tenor to his comments. All understood the General to say he found an inconsistency in a commander recommending a discharge level court-martial and then, at trial, recommending retention. One understood the General to mean, "[I]f I prefer somebody for court-martial charges, that I should not testify on their behalf." Another said that the General was visibly upset and his anger could be felt when he said he could not believe a commander would press charges against a soldier and then go back and testify for him. Some of these captains understood that the General was talking only about testimony after findings. Others did not understand that distinction. Several of the captains thought that what the General said was wrong. One officer could not recall all of the General's words but said, "I remember he began the subject by saying, 'What really pisses me off is when a chain of command prosecutes a soldier and then testifies they'd take him back into the unit or that he's a great guy. Soldiers are good soldiers 24 hours a day.' " This same officer said, "[T]he CG could not understand a leader prosecuting a soldier and being able to testify as to his good soldierly qualities. To him the two just did not equate." Another captain said he believed that he had gotten a lower officer efficiency report because he had testified favorably for a soldier in a court-martial. Another gave the following testimony:

Q: Now, if you had to put the best light, if you had to rationalize it in the best light, what the commanding general said, as a commander, what was he telling you?

A: Not to be stupid when you get up to testify, to downplay the good points of a soldier and bring to light the bad things about him.

Q: All right. And in the worst light?

A: In the worst light, I would say that he was asking me not to tell the truth.

Q: What was the actual impression you got from what the commanding general told you in Friedberg?

A: Somewhere in between those, that he just wanted me to suppress the truth.

Q: Did you misunderstand the commanding general?

A: No. I did not.

Q: Do you feel you misinterpreted what he was telling you?

A: I don't think I misinterpreted it. I may not have got the message that he wanted to get across to me. But there's no way—there wasn't any other way to interpret it.

Five company grade officers who did not hear the General's lectures testified that they were told by their chain of command that the General was displeased by those who testified on behalf of soldiers at courts-martial. One, a lieutenant, said that he was told "it didn't look good for the United States Army to put a soldier on trial in a court-martial and then have an officer standing up there and affirm that he was a good soldier, a good worker, concerning retainability." Another, a captain, commented upon whether the General might have been misunderstood or misinterpreted by saying:

As a battery commander, it's happened to me, and I've seen it happen to other commanders, where the commander or the first sergeant gets up in front of the formation and says something to the formation, and then that troop goes to the IG, or he goes to the colonel, or whatever, and then the colonel calls you in, and he says, you said so and so at a formation, this is what that troop is saying now, and the commander or the first sergeant, and I've done this before, "Well, sir, that's not what I meant to say." And he answers, "Well, Captain [W.,] regardless of what you meant to say, it's what that soldier perceives, that's what is truth for him, regardless of what you meant." Right. I mean, I've heard that quoted a hundred times to battery level commanders. I think the same thing applies here, regardless of what he meant to say, with all due respect for him, regardless of what he meant to say, that's not how it came across. You know, if I was the only guy

that thought that, then I would think maybe I was out of step, but I'm not the only one who thought that.

General Anderson's instructions were not limited to his officers. He also spoke to many gatherings of senior noncommissioned officers, primarily first sergeants and sergeants major. At one of the meetings, the General's opening remarks were to the effect that if he had it in his power he would reduce some master sergeants and sergeants major, a sure attention-getter for senior noncomissioned officers. At least ten senior noncommissioned officers indicated they understood the General's remarks to mean that he did not want the chain of command testifying in favor of an accused soldier, for noncommissioned officers should support their commanders in things of this nature. Some thought it would be harmful for them to testify. Although some thought the General's remarks were limited to testimony in extenuation and mitigation after findings, others did not understand such a distinction and took the General to be referring to all testimony. One sergeant first class remarked, "[H]e definitely indicated to us that as NCOs we would support his command and that we would not go up and testify on behalf of a soldier the chain of command had put up for a court-martial." Another said he took some of the General's remarks to mean that it would be foolish for him to offer character testimony for someone because the General would "cut [his] head off." A company first sergeant testified, "As near as I can remember, sir, he stated that he did not particularly care for senior noncommissioned officers testifying for accused soldiers at courts-martials [sic]." The sergeant also said the admonition was not limited to testimony for convicted soldiers, and the General was serious when he said this. Several said the General became emotional, raised his voice, or made motions with his hands while he talked to them on this subject. One first sergeant understood that it was permissible to testify for a good soldier but not for a 'dirt-ball." Another first sergeant said the General's remarks "ate me up for a long time." He said he felt "this justice system is all we've got," and if asked to be a character witness, he felt he should have the freedom to do so. A command sergeant major said the General's comments created "heartburn" for him and he did not think the General was right. This witness further remarked, "You know, the soldier has still got a right to pick someone to speak for him. The court would determine the guilt or innocence." Several other noncommissioned officers who did not hear the General speak provided evidence that they were told by their chain of command of a division policy regarding testimony at courts-martial, and the guidance given them was that they were not to testify on behalf of a bad soldier. One company first sergeant said his battalion commander "chewed him out" for providing favorable information about an accused soldier on an evaluation form to be used at his court-martial.

## II

Military accused are guaranteed a fair trial. *United States v. Rowe*, 11 M.J. 11 (C.M.A.1981); *United States v. Ross*, 7 M.J. 174 (C.M.A.1979); *United States v. Clay*, 1 U.S.C.M.A. 74, 1 C.M.R. 74 (1951). In part this means that courts-martial must be free from any unlawful influence exerted by any military superior. *United States v. Olson*, 11 U.S.C.M.A. 286, 29 C.M.R. 102 (1960); *United States v. Whitley*, 5 U.S.C.M.A. 786, 19 C.M.R. 82 (1955); *United States v. Navarre*, 5 U.S.C.M.A. 32, 37, 17 C.M.R. 32, 37 (1954); Article 37, Uniform Code of Military Justice, 10 U.S.C. § 837 (1982). As a corollary to this principle, an accused is entitled to witnesses testifying on his behalf without fear of reprisal. *United States v. Charles*, 15 M.J. 509 (A.F. C.M.R.1982). The appearance of command influence, much less its actual existence, is presumed prejudicial until the Government clearly and positively proves it had no effect. *United States v. Rosser*, 6 M.J. at 272. *See United States v. Johnson*, 14 U.S.C.M.A. 548, 34 C.M.R. 328 (1964); *United States v. Littrice*, 3 U.S.C.M.A.

487, 13 C.M.R. 43 (1953) (unlawful pressure upon court members presumed to influence them until rebutted); *United States v. Rodriquez,* 16 M.J. 740 (A.F.C.M.R.1983) (witnesses).

Admittedly, evidence is sparse on the direct effect of General Anderson's conduct upon the appellant's pleas of guilty. This is not surprising. As the Court of Military Appeals recently observed, "[I]t is well established that unlawful command influence may assume many forms, may be difficult to uncover, and affects court members in unsuspecting ways." *United States v. Karlson,* 16 M.J. 469, 474 (C.M.A.1983) (citations omitted). First of all, the evidence I have discussed came primarily from the determined efforts of trial defense counsel in their representation of other clients in other cases. This evidence was not easily gathered by them. Some witnesses who heard the General's remarks initially were free and open when discussing with defense counsel their perceptions of the General's lectures, but later became reticent after their supervisor or, in one case, the Staff Judge Advocate, talked to them. This problem was illustrated by a battalion commander who is said to have asked several defense counsel, "Why [are] a bunch of captains and majors...ganging up on a two star[?]" He also asked counsel why they were still pursuing "this matter," and then somewhat cryptically said that what they were doing "was not in the best interests of all concerned." *Cf. United States v. Kitchens,* 12 U.S.C.M.A. 589, 592 n. 3, 31 C.M.R. 175, 178 n. 3 (1961) (allegation of retaliation against defense counsel who raised command influence). Secondly, subordinates subjected to such pressures often are faced with conflicting concerns for their careers and the desire to do the right thing and may not be able to accurately discern the effects of their superiors' conduct. *United States v. Rosser,* 6 M.J. at

272; *United States v. Zagar,* 5 U.S.C.M.A. 410, 414, 18 C.M.R. 34, 38 (1955). Moreover, this issue was not explored at the trial because neither the appellant nor his counsel knew of General Anderson's conduct. Unbeknownst to them, an artificial barrier had been erected in front of the courtroom door, a barrier designed to keep out witnesses favorable to the appellant. Some witnesses did appear for the appellant,[2] but I do not know whether the barrier excluded others who might have testified on the merits or sentencing, or whether it affected his decision to plead guilty. "As a matter of principle, any doubt in this matter must be resolved in favor of the accused." *United States v. Johnson,* 14 U.S.C.M.A. at 551, 34 C.M.R. at 331. *United States v. Karlson,* 16 M.J. at 474. Therefore, since the presumption of prejudice has not been rebutted, I find that the appellant has been denied his right to a fair trial and would set aside the findings and sentence and authorize a rehearing ordered by a different convening authority.[3] *United States v. Rodriquez,* 16 M.J. at 743, and cases cited therein. *See also Homcy v. Resor,* 455 F.2d 1345, 1352 (D.C.Cir.1971) (unlawful command influence on coerced court is a deprivation of constitutional right to fair trial).

Unlike the majority, I find the traditional principles governing the legality of guilty pleas inadequate to the task at hand. The majority holds that even if potential character witnesses were unlawfully influenced, the appellant's pleas of guilty are provident because he has not established that this fact substantially affected his pleas. The issue, however, is not whether his pleas are provident; my concern is whether the appellant received a fair trial. Additionally, this shift of the burden of proof from the Government to the appellant is impermissible. Unlawful command influence is

---

2. The appellant's battalion commander, who had attended at least one of the General's military justice lectures, testified on rebuttal that the appellant should not be allowed to remain in the Army.

3. I believe that the majority's use of the evidence in the record of *United States v. Giarratano,* S.P.C.M. 20588, to support findings against the appellant—although they claim otherwise—ignores the mandate of *United States v. Karlson, supra. See United States v. Piatt,* 17 M.J. 442, 447 (C.M.A.1984).

unique and the dangers it poses are unparalleled. As a result, military appellate courts have long been sensitive to its nature and "pernicious effect not only on military justice but on discipline and morale as well." *United States v. Karlson*, 16 M.J. at 474 (citations omitted); *United States v. Olson, supra; United States v. Rodriquez, supra. See also United States v. Navarre*, 5 U.S.C.M.A. at 43, 17 C.M.R. at 43 (Brosman, J., concurring) (unlawful command influence is "a problem of such overwhelming importance in the scheme of military justice that it may be said to lie at the very core of the Code"). Thus, the Court of Military Appeals allows little "leeway" in the resolution of illegal command control matters. *United States v. Davenport*, 17 M.J. 242, 246 (C.M.A.1984). *See also United States v. Blaylock*, 15 M.J. 190, 193 (C.M.A.1983). To me, only one question need be answered: Has the presumption that potential witnesses were affected by the pervasive activities of General Anderson and his command been rebutted clearly and positively?

One last point: I do not attribute a malicious intent to the General. I believe he wanted to enhance the discipline and readiness of his command by expunging what he considered to be ineffective and undesirable soldiers. Unfortunately, because of who he was, the position he occupied, and the way he went about it, his conduct was unlawful and its effects far-reaching. As a commander and general court-martial convening authority, he should have realized that his voice represented to his subordinates the authority which their oaths of office or enlistment bound them to obey. Put in simple terms by a captain who testified on this issue, "When a Major General indicates displeasure over a situation people act to ensure the situation doesn't happen again." The impact of any conduct or action on his part in violation of Article 37, Uniform Code of Military Justice, resounds further, greater, and longer than does that of any other official in the court-martial system. This is true not only because of the potential repercussions upon persons tried by court-martial, but also because of

the effect of unlawful influence upon the administration of criminal justice in the court-martial system. *United States v. Rosser, supra.* Measured in these terms, General Anderson's conduct can only be described as disastrous. I find that his conduct violated Article 37, Uniform Code of Military Justice, and was so pervasive, serious, and destructive to the court-martial process as to require setting aside both the findings and sentence regardless of the lack of any "specific prejudice" the appellant may have suffered. *United States v. Whitley*, 5 U.S.C.M.A. at 792, 19 C.M.R. at 88 (Brosman, J., concurring); *see also United States v. Lynch*, 9 U.S.C.M.A. 523, 26 C.M.R. 303 (1958); *United States v. Daniels*, 27 C.M.R. 527 (A.B.R.1958). I therefore respectfully dissent from that portion of the majority opinion that affirms the findings.